7 A.3d 1115

Thomas WOOD, Jr.

v.

STATE of Maryland.

No. 1378, Sept. Term, 2009.

Court of Special Appeals of Maryland.

Nov. 3, 2010.

148

Bradford C. Peabody (Paul B. DeWolfe, Public Defender, on the brief) Baltimore, MD, for appellant.

Ryan R. Dietrich (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: KRAUSER, C.J., MATRICCIANI, CHARLES E. MOYLAN, JR., (Retired, Specially Assigned), JJ.

CHARLES E. MOYLAN, JR., J. (Retired, Specially Assigned).

The leitmotif of this opinion is that the unreliability of an extrajudicial identification is not an exclusionary factor. It is rather the case that the reliability of such an identification is an ameliorative factor that precludes exclusion. Although both items are, to be sure, related in one way or another to the phenomenon of sinking, we must not confuse the lifeboat with the torpedo. The purpose of a reliability inquiry can only

truly be understood when constitutional identification law is viewed in historic perspective. The danger is that zealous advocates, particularly after a generational change, will cherry-pick choice sentences and phrases from the old cases and then misapply them to situations totally foreign to the context that originally gave them life.

### The Present Case

The appellant, Thomas Wood, Jr., was found guilty, on an agreed statement of facts, by Judge Thomas G. Ross, sitting without a jury in the Circuit Court for Queen Anne's County, on two separate charges of robbery. On this appeal, he raises the three contentions

1. that the evidence was not legally sufficient to sustain the verdicts;

2. that Judge Ross erroneously failed to suppress three extrajudicial identifications of the appellant; and

3. that Judge Ross erroneously failed to suppress the physical evidence.

### Legal Sufficiency of the Evidence

Contrary to the first contention, the evidence abundantly supported both convictions. A brief summary of it will help to place the other contentions in understandable context.

### A. Kent Island Robbery

An armed holdup was committed at the Kent Island Texaco Station at 400 Thompson Creek Road in Stevensville, Queen Anne's County, on December 13, 2008, at approximately 2:00 A.M. The lone clerk on duty, Thomas Davidson, described his assailant as an African–American male approximately six feet tall, weighing about 250 pounds, and wearing all black clothing. The assailant was armed with what appeared to be a black handgun. He demanded money. Mr. Davidson turned over money from both the cash register and the store safe. The robber also took several packs of Newport cigarettes.

At just about that time, James Taylor, a newspaper delivery man, observed a suspect run from the Texaco Station to an SUV (a sport utility vehicle) and drive quickly away from the area. Surveillance cameras captured a picture of the SUV, which appeared to be a silver Lincoln Aviator. It was parked at the gas pumps during the commission of the robbery. The video camera showed the SUV leaving the scene, headed westbound.

Corporal Eric Ferber of the Maryland Transportation Authority Police subsequently retrieved data from the Homeland Security cameras on the William Preston Lane Bridge (the Bay Bridge). They revealed a Lincoln Aviator SUV heading westbound over the bridge with Maryland tags 961M179 at approximately 2:00 A.M. on December 13. The tags were registered to the appellant, Thomas Wood, Jr., living at 1275 Kitmore Road in Baltimore City.

The appellant's MVA photo showed that he matched the description given by Mr. Davidson. From a photo array, Mr. Davidson was able to pick out the photograph of the appellant as "looking like" the man who robbed him. A subsequent search of the appellant's Lincoln Aviator SUV produced a black .177 caliber Marksman air pistol. The agreed statement of facts further recited that Mr. Davidson, after seeing the appellant in person, would have identified him in the courtroom as his assailant.

## B. Queenstown Robbery

■ The second robbery was committed two weeks later, on December 27, 2008, at the Xtra Mart at 46380 Ocean Highway in Queenstown, Queen Anne's County. Christine Middleton was the clerk on duty and Michelle Mogavero was also present at shortly after midnight, when an African–American male, approximately six feet tall and weighing "in excess of 200 pounds," entered the store. He pointed a black handgun at Ms. Middleton and ordered her to lie on the floor. He went through her purse, from which he removed two

checks. He also took cash from the cash register and New-port cigarettes.

Both Ms. Middleton and Ms. Mogavero selected a photo-graph of the appellant from a photo array as "most resem-bling" the robber. Both witnesses stated, after seeing the appellant, that they would have positively identified him in court as the robber.

As the appellant ordered Ms. Middleton to lie on the floor, moreover, he struck her on the head with the black gun. When a black gun was seized from the appellant's SUV on January 2, 2009, a single strand of blond hair was recovered from the gun sight. Forensic examination showed that it had come from the head of Ms. Middleton.

The evidence was unquestionably sufficient to sustain both robbery convictions.

### Reliability: The Right Pew Perhaps But the Wrong Church

The appellant's second contention is that evidence of the extrajudicial photographic identifications of the appellant should have been suppressed because they were unreliable. The appellant's resort to the reliability/unreliability factor is what gives rise to the major theme of this opinion. If there were a book on the subject of *Appellate Game Theory* (there is not), this appeal could furnish rich examples for a chapter inevitably entitled "Diversionary Appellate Strategies" or "How to Finesse the Flaw of Immateriality." If the defense boldly asserts, "The extrajudicial identification was unrelia-ble," and the State and/or court strongly believes that it was, to the contrary, very reliable, battle will almost reflexively be joined on that narrowly particularized issue. Lost in the din of battle may be the more pertinent and dispositive question of, "Does it really make any difference, one way or the other?" Obsessed with the factual yin and yang of the microcosm, everyone (including the court) can too easily neglect the threshold of materiality. Far from being inelegant, therefore, it should be the prime directive of appellate inquiry constantly

to ask, "So what?" It is never out of place to question materiality.

In making this contention, the appellant boldly asserts that Judge Ross erroneously failed to suppress evidence of three extrajudicial identifications of the appellant. He contends that photographic identifications of him by Thomas Davidson from the Kent Island Texaco Station robbery and by both Christine Middleton and Michelle Mogavero from the Queenstown Xtra Mart robbery should have been suppressed because they were unreliable. The appellant's argument relies heavily on 1) the fact that one of these robbery victims was forced to lie down on the floor and was not, therefore, in the best position to observe the robber and 2) on the fact that several of the identifications were initially stated in arguably equivocal terms with less than ironclad certitude.

To some extent, although not totally, the State takes the bait and spends at least 50% of its appellate effort in bolstering the challenged reliability by running through, at length, the five-factored guidelines of *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), and *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). *And see James v. State,* 191 Md.App. 233, 253, 991 A.2d 122 (2010). The appellant and the State go back and forth in what would be a spirited and appropriate tug of war before a fact finder on the ultimate issue of guilt or innocence. The pertinent issue before us on this appeal, however, is not guilt or innocence, as a matter of fact, but the exclusion of evidence, as a matter of law. What might be persuasive argument on guilt or innocence is not necessarily pertinent argument on pretrial suppression. The appellant is reciting the reliability doxology in the wrong church.

The reliability of evidence, in and of itself, is fundamentally a jury issue and not an exclusionary issue. The exclusion of an extrajudicial identification, as a matter of law, is a constitutional question, requiring some improper "state action" by way of violating either the Sixth Amendment's right to the assistance of counsel or the due process clause of the Fourteenth

Amendment. The inherent unreliability of an identification, however, is not in and of itself the fulcrum for either one of those unconstitutionalities.

To argue for the exclusion of an extrajudicial identification, as a matter of law, is now a very dated tactic, although it was once, for a brief time, a popular appellate favorite. Our response to the now faded contention requires us to revisit briefly the basic reasons that caused the contention quickly to fall out of fashion. In *Turner v. State*, 184 Md.App. 175, 176–77, 964 A.2d 695 (2009), a case involving a similar contention to the one now being made, we noted the subject's heyday and its early demise:

> The contention evokes nostalgic memories of a period between 30 and 40 years ago when the constitutional law bearing on extrajudicial identification was at the front and center of legal consciousness. *The juridical celebrity of the subject first rose and then fell in the decade between June of 1967 and June of 1977.* It was in that time a regular centerpiece at all continuing legal education seminars. As will be seen as our analysis unfolds, however, *that once vital concern has more recently been reduced to little more than a sideshow, now a matter far more for jury argument than for constitutional exclusion.*

(Emphasis supplied).

### The Fourteenth Amendment And the Necessity for State Action

■ At the most basic level, the relatively recent (post-*Mapp v. Ohio* in 1961) burgeoning of pretrial suppression hearings is a product of the so-called Warren Court Revolution and its transformative effect on procedures in state criminal trials. Central to understanding that entire phenomenon is an appreciation that in the phrase "constitutional law," the modifying adjective "constitutional" serves a critical and limiting function. It is something quite distinct from evidentiary law. In state criminal trials, the manifold protections of the federal Bill of Rights (essentially the first eight amendments) are only applicable to the states because they have,

over the years and one by one, been deemed to be incorporated (or absorbed) into the due process clause of the Fourteenth Amendment. The coverage provision of that Fourteenth Amendment begins with what are undoubtedly the three most important words in all of constitutional history: "No state shall . . ."

For constitutional law to apply in a state criminal trial, there must first and foremost be "state action." In *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), Chief Justice Rehnquist pointed out that an allegedly involuntary confession could only be challenged as a matter of *constitutional* law if the agents of the alleged involuntariness had been City of Denver or State of Colorado law enforcement officials. The Supreme Court noted, 479 U.S. at 164, 107 S.Ct. 515:

> *Absent police conduct* causally related to the confession, *there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law.*

(Emphasis supplied). Chief Justice Rehnquist went on, *id.* at 165, 107 S.Ct. 515:

> Our "involuntary confession" jurisprudence is entirely consistent with the settled law *requiring some sort of "state action" to support a claim of violation of the Due Process Clause* of the Fourteenth Amendment. The Colorado trial court found that *the police committed no wrongful acts,* and that finding has been neither challenged by the respondent nor disturbed by the Supreme Court of Colorado.

(Emphasis supplied).

Private action, good or bad, reasonable or unreasonable, simply does not qualify for constitutional exclusion:

> *The most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause* . . . [S]uppressing respondent's statements would serve absolutely no purpose in enforcing constitutional guarantees. *The purpose of excluding evidence seized in violation of the*

*Constitution is to substantially deter future violations of the Constitution.*

479 U.S. at 166, 107 S.Ct. 515 (emphasis supplied).

To the extent to which the challenged confession might have been otherwise unreliable, that would be a concern only for the evidentiary law of Colorado and not a concern of constitutional law.

We think *the Constitution rightly leaves this sort of inquiry to* be resolved by *state laws governing the admission of evidence* and erects no standard of its own in this area. *A statement* rendered by one in the condition of respondent *might be* proved to be *quite unreliable, but this is a matter to be governed by the evidentiary laws* of the forum.

479 U.S. at 167, 107 S.Ct. 515 (emphasis supplied).

The same necessity for state action limits the Fourth Amendment's exclusionary rule to unreasonable searches or seizures conducted by government agents and does not apply to equally unreasonable searches or seizures carried out by private persons. *Burdeau v. McDowell,* 256 U.S. 465, 475, 41 S.Ct. 574, 65 L.Ed. 1048 (1921) ("In the present case the record clearly shows that no official of the Federal Government had anything to do with the wrongful seizure of the petitioner's property ... It is manifest that there was no invasion of the security afforded by the Fourth Amendment against unreasonable search and seizure, as whatever wrong was done was the act of individuals...."); *Coolidge v. New Hampshire,* 403 U.S. 443, 488, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) ("If the exclusionary rule is properly applicable to the evidence taken from the Coolidge house on the night of February 2, it must be upon the basis that some type of unconstitutional police conduct occurred."); *Walter v. United States,* 447 U.S. 649, 656, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980) ("It has been settled since *Burdeau v. McDowell* that a wrongful search or seizure conducted by a private party does not violate the Fourth Amendment and that such private wrongdoing does not deprive the government of the right to

use evidence that it has acquired lawfully."); *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984) ("This Court has also consistently construed this protection as proscribing only governmental action; it is wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual.' ").

In the present case, the appellant has not remotely asserted that any suggestive or otherwise improper procedure was employed by the police officers who conducted the photographic arrays. With respect to any of the three photographic identifications of the appellant by the three witnesses to the robberies in this case, the appellant has not pointed to a single suggestive action engaged in by any member of the Queen Anne's County Sheriff's Department or by the Baltimore City Police Department or by anyone connected with the investigation or the prosecution of this case.

Although the record in this regard was not fully developed at the suppression hearing, a local newspaper apparently ran a story about one or both of the robberies. Accompanying it was an MVA picture of the appellant. Two of the witnesses saw the photograph in the newspaper and later testified that when they saw it, they were absolutely certain that it was a photograph of the robber. That photograph apparently showed the appellant wearing glasses, whereas in the earlier photographic array he had not been wearing glasses. The investigating police, however, had nothing to do with the viewing of the newspaper by the witnesses. The Fourteenth Amendment, of course, does not apply to the local newspaper, nor does it apply to the two witnesses who looked at the local newspaper.

There was, thus, no state action that could even be unconstitutional. The appellant's only complaints were that the witnesses either were not in a position to have had a good view at the crime scene or that the original photographic identifications were made by them with less than absolute certainty. Those might be good arguments before the ultimate fact finder, but they have nothing to do with constitutional sup-

pression. The infinite factors bearing on the trustworthiness, the reliability, and the ultimate weight of evidence are things that are classically tested by cross-examination and argued to a jury. They are grist for the trial process. They are not factors calling for constitutional exclusion, as a matter of law.

## A Meteoric Rise and Fall

Constitutional identification law, which the appellant is invoking, enjoyed a precise decade (plus four days) of high-profile celebrity between 1967 and 1977. During that decade, it rivaled confession law and search and seizure law in the national spotlight. It commanded the attention of academic seminars and law reviews. It began with a sunburst on June 12, 1967 as the *Wade–Gilbert–Stovall* trilogy rocketed onto the national stage.

Initially, the big stars of that trio were *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). The constitutional principle which they championed was the Sixth Amendment's guarantee of the assistance of counsel to a defendant. For the first time in constitutional history, the placing of a suspect in a police line-up for identification purposes was deemed to be a "critical stage." These are classic Sixth Amendment code words. If a defendant were placed in such a line-up without a lawyer having been provided and present, exclusion of the identification was automatically called for. Such exclusion was in high vogue, and everyone was talking about identification procedures.

Within five years, however, a Thermidorean Reaction set in. *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), first held that a suspect placed in a pre-indictment, as opposed to a post-indictment, line-up did not yet enjoy the protection of the Sixth Amendment because such a suspect was not yet an "accused." Being at a critical stage would qualify an "accused" for Sixth Amendment assistance, but if you are not yet "accused" even a critical stage would not help. Whatever little wind still propelled the exclusionary sails after *Kirby,* it was largely wafted away by the subsequent holding

in *United States v. Ash,* 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973), that even a post-indictment exhibition of a photograph of a subject, either in a group picture or as part of an array of individual photographs, was, unlike standing the suspect in a live line-up, not a critical stage. Whereas *Kirby* had diminished the ranks of the "accused," *Ash* diminished the incidence of a "critical stage." As a basis for challenging extrajudicial identification, the Sixth Amendment essentially disappeared from the scene within five years of its initial appearance. As this Court noted in *Turner v. State,* 184 Md.App. at 179, 964 A.2d 695:

> Under the combined impact of *Kirby* and *Ash, the post-indictment line-up essentially disappeared from the world of criminal investigation, and with it any significant exclusion of identification evidence based on the Sixth Amendment's right to counsel.* The once familiar line-up parade of stage and screen has been retired to the Smithsonian. *Creative law enforcement procedures effectively finessed the Sixth Amendment.*

(Emphasis supplied). *Wade* and *Gilbert* are has-beens; they are yesterday's stars.

### Impermissible Suggestiveness

With *Wade* and *Gilbert* largely relegated to the sidelines, attention shifted to the third case in the 1967 trilogy, *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). *Stovall,* unlike *Wade* and *Gilbert,* was grounded in the due process clause. It was initially thought to be available in cases where governmental agents had subjected a suspect to impermissibly suggestive identification procedures.

Even then, however, there were at least two requirements for exclusion. The suppression of an extrajudicial identification, as a matter of law, pursuant to the due process clause depended not only on suggestive procedures having been employed by the police but also on the further misfeasance that those suggestive procedures were impermissible rather than being born of the exigency then facing the police. In

*Turner,* 184 Md.App. at 180, 964 A.2d 695, this Court elaborated on the two-fold nature of the exclusionary inquiry.

> In *Stovall v. Denno* itself, *the Supreme Court did not hold that the questionable identification evidence there should be suppressed.* It rather affirmed the legitimacy of *that one-on-one show-up in a hospital room* on the ground that it, *albeit unquestionably suggestive, was necessary and, therefore, not impermissible.* By its very nature, of course, a one-on-one show-up is suggestive, just as 99 out of every 100 judicial or in-court identifications are suggestive. (It is always a good bet that the person the witness is being asked to identify is the guy sitting at the trial table who is not dressed like a lawyer.) A jury, however, is perfectly capable of weighing the pluses and minuses of such an identification. That is why mere suggestiveness does not call for exclusion. *Stovall* pointed out that it is not a due process violation *per se* that an identification procedure is suggestive. It must be not only suggestive, but *impermissibly* suggestive. *Many self-evidently suggestive one-on-one show-ups shortly after a crime has occurred are deemed to be permissibly suggestive, and therefore unoffending, because of the exigent need to take quick action before the trail goes cold.*

(Emphasis supplied). Many extrajudicial identifications were nonetheless suppressed because the identification procedures used by the police were not only suggestive but were also impermissibly so.

### Reliability to the Rescue

In 1968, *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), came riding, like the cavalry of old, to the rescue of beleaguered police identification procedures. *Simmons* fine-turned the due process test of *Stovall v. Denno.* Even impermissible suggestiveness on the part of the police would not, *ipso facto,* call for suppression as a matter of law. *Simmons* made it clear that evidence of an identification will not be excluded unless the identification procedure was "so impermissibly suggestive as to give rise to *a very substan-*

*tial likelihood of irreparable misidentification."* 390 U.S. at 384, 88 S.Ct. 967 (emphasis supplied).

With *Simmons,* the focus turned to the ultimate reliability of the identification in question. If the identification is reliable, it is by definition not a "misidentification," and is not, therefore, subject to the exclusionary sanction. The focus, moreover, is on the trustworthiness of the evidence itself and not on the behavior of the police. The due process clause does not use the exclusionary sanction to regulate police procedures *per se,* unless those procedures produce unreliable evidence. The tilt, moreover, favors reliability, because the evidence will not be excluded unless there is **a very substantial likelihood** of misidentification. A mere possibility will not suffice. If the evidence is reliable notwithstanding improper antecedent procedures, it will not be suppressed.

From the first injection of reliability into the constitutional equation, it self-evidently was not a basis for exclusion but was quite the opposite. It was a limitation on exclusion. One does not look at the reliability of the evidence in a vacuum. Presumptive exclusion is based solely on impermissibly suggestive procedures having been used by the police. Reliability is then the exception to exclusion that can "trump" even impermissible suggestiveness. In *James v. State,* 191 Md.App. 233, 252, 991 A.2d 122 (2010), Judge Meredith explained the two-step nature of the inquiry:

Courts follow *a two-step inquiry* to determine the admissibility of disputed identification *evidence alleged to be the product of unduly suggestive pre-trial identification procedures. The accused,* in his challenge to such evidence, *bears the initial burden of showing that the procedure employed to obtain the identification was unduly suggestive.* Once this showing is made, *the court must then determine whether,* based on the totality of the circumstances, *the identification was reliable despite the suggestiveness of the confrontation procedure.* Although the reliability of the identification is the "linchpin" question, *if the identification*

*procedure is not unduly suggestive, then our inquiry is at an end.*

(Emphasis supplied).

In *Gatewood v. State,* 158 Md.App. 458, 475, 857 A.2d 590 (2004), Judge Sharer had similarly analyzed the two-step procedure:

> *Our inquiry follows two steps. The accused,* in his challenge to such evidence, *bears the initial burden of showing that the procedure employed to obtain the identification was unduly suggestive.* Should this showing be made, the State must then prove ... that the independent reliability in the identification outweighs the "corrupting effect of the suggestive procedure."

(Emphasis supplied). Reliability thus does not even become an issue for a suppression hearing until impermissible suggestiveness has been shown. The quality of the lifeboat does not become an issue until the torpedo of impermissible suggestiveness hits the ship.

With the shift of emphasis to the subject of reliability, attention turned to the development of guidelines to assist in the appraisal of reliability. *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), began the process:

> As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

Although *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), essentially recapitulated what *Neil v. Biggers* had already said about the assessment of reliability, the reaffirmation was necessary because the earlier discussion had only been part of a plurality opinion. *Manson v. Brathwaite* impressed the seal of binding authority on the *Neil v. Biggers* analysis. We have refrained from mentioning any of

the reliability factors because, on the issue of suppression in this case, they do not matter.

A reliability appraisal, moreover, is extremely fact-specific. It is a multi-factored determination that, with the help of guidelines, looks to the totality of the circumstances. Except in limited circumstances wherein it is called upon to override a presumptive exclusion of an extrajudicial identification, a reliability determination is classic grist for the jury's mill, as a matter of fact, and not for a suppression hearing judge, as a matter of law. *Manson v. Brathwaite,* 432 U.S. at 116, 97 S.Ct. 2243, was incisive in this regard.

> Surely, we cannot say that under all the circumstances of this case there is "a very substantial likelihood of irreparable misidentification." *Short of that point, such evidence is for the jury to weigh.* We are content to rely upon the good sense and judgment of American juries, for *evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.*

(Emphasis supplied).

With the filing of *Manson v. Brathwaite,* identification law's season in the constitutional sun was effectively over. Reliability is quintessentially a jury question and an evidentiary issue. Even in those limited circumstances in which it might play a role in precluding pretrial suppression, it is not a catalyst for suppression but an antidote thereto.

■ The overarching principle, which the appellant in this case conveniently neglects and presumably would have us neglect, is that although the reliability of an extrajudicial identification may sometimes serve as a counterweight to overcome what might otherwise be the exclusion of evidence based on impermissibly suggestive investigative procedures, the unreliability of an identification, *per se,* is not, and never has been, a basis for excluding such evidence. Exclusion is not the norm, and the mere absence of a particular reason for not doing something is not, *ipso facto,* an operative reason for

doing something. As the appellant here, however, jumps into the pool and starts splashing about on the subject of reliability and the State starts splashing back, it is hard not to pay attention to it and to remember that the whole splashing episode, whichever way it goes, is meaningless. It is quintessentially a distraction. Judge Ross was not in error in refusing to be thus distracted.

## The Fourth Amendment Omnibus

A pretrial suppression hearing was held on July 13, 2009. The appellant at that hearing, in addition to challenging the extrajudicial identifications, sought to have suppressed the physical evidence seized in the warranted search of the appellant's automobile on January 2, 2009. Judge Ross denied the motion.

In the course of two pages, the appellant has raised no less than six Fourth Amendment subcontentions. Each of them is essentially a bald assertion, with little or no supporting argument or citation of law. There is, moreover, no clear invocation of an exclusionary principle. Although the appellant's goal at the suppression hearing was the exclusion of evidence, he invokes no identifiable exclusionary principle. If the appellant is invoking the Exclusionary Rule of *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), for a violation of the federal Fourth Amendment, he does not tell us. If the appellant is asking us to propound a new Maryland Exclusionary Rule that might cover even sub-constitutional improprieties, he does make such a request. We are not about to write a treatise responding to an infinitude of conceivable arguments that the appellant might have made, but did not.

## A. Probable Cause For the Warrant:

The first of the appellant's subcontentions asserts that there was no probable cause for the issuance of the search warrant:

First, probable cause for issuance of the search warrant could not be found within the "four corners" of Detective Stouffer's application for a search warrant. *Fitzgerald v.*

*State,* 153 Md.App. 601, 639, 837 A.2d 989 (2003) ("at a suppression hearing challenging the issuance of a search warrant, the only evidence that should be considered by the court is that which is confined within the 'four corners' of the warrant and its application."); *Herbert v. State,* 136 Md.App. 458, 471–72 n. 1, 766 A.2d 190 (2001) (" 'four corners' doctrine").

Aside from two citations to the "four corners" doctrine, the appellant cites no case law that throws light on the issue of probable cause. The appellant makes no argument as to how or in what way probable cause is lacking. He simply asserts that "probable cause for the issuance of the search warrant could not be found [in the] application." Although it would be easy to say that we have read the warrant application and find that it does, indeed, establish probable cause, we decline to do so because that would be indulging the appellant more than he deserves.

■ A judicially issued search warrant is presumptively valid, and the burden is allocated to the defendant to rebut that presumed validity. A mere assertion is not an effective rebuttal. Because the appellant here has done nothing by way of rebuttal, the presumptive validity of the warrant still stands, unrebutted. To find it valid all over again would be superfluous.

## B. Authority to Serve the Warrant:

The appellant's second subcontention concerns whether the officer who executed the warrant had authority to do so.

Second, the judge issuing the warrant "specifically struck out language that would conceivably grant authority for assistance from another jurisdiction," in serving the warrant. However, here, the Baltimore City SWAT Team used a ram to batter open the door of Appellant's apartment, threw a "percussion grenade" inside, and placed Appellant and Mrs. Wood in "flex cuffs"; whereupon, Detective Stouffer actually served the search warrant. Under the terms of the warrant, as the defense noted, the Queen Anne's County

Sheriff's Department had "no jurisdiction" to serve this search warrant in Baltimore City. *See generally* Maryland Code, Criminal Procedure Article, Sections 1–203 ("Search warrants") and 2–102 ("Authority of police officers—In general").

Although it would be easy for us to hold that we see no violation of Maryland Code, Criminal Procedure Article, §§ 1–203 or 2–102, once again we decline to do so. Even if, purely *arguendo*, either or both of those statutory provisions had been violated, that would not have affected Judge Ross's ruling at the suppression hearing in any way. The only operational exclusionary rule that we can conceive of as having any applicability to this case would be that of *Mapp v. Ohio* for a violation of the federal Fourth Amendment. The appellant has not persuaded us how a violation of either §§ 1–203 or 2–102 of the Maryland Code would be a constitutional violation of the Fourth Amendment. *And see Miller v. State,* 151 Md.App. 235, 247, 824 A.2d 1017 (2003).

### C.  Description of Vehicle To Be Searched:

In his third subcontention, the appellant seems to be invoking the particularity clause of the Fourth Amendment (that assumption will, at least, get him past the *Mapp v. Ohio* Exclusionary Rule hurdle).

Third, under Maryland Code, Criminal Procedure Article, Section 1–203(a)(3)(ii), the affiant is required to "name or describe, with reasonable particularity," *inter alia*: "1. the person, building, apartment, premises, place, or thing to be searched." The apartment complex involved has no private parking. Therefore, here, the warrant broadly authorized the intrusive search of "any and all motor vehicles," without excluding "any motor vehicle in the neighborhood of the apartment complex," whatsoever. The application should have listed the specific SUV that the detective wanted to search. Instead, in the search warrant, the police were commanded "to search the aforementioned residence, and persons including *any and all motor vehicles,* outbuildings or outdoor storage facilities *found on said premises* . . . ."

■  The search of a residence would embrace the search of a vehicle parked on that residential property and belonging to the owner of the residence. If in this case, however, the police failed to anticipate that the appellant's residence did not have its own exclusive driveway or parking space but utilized the more general parking lot of the apartment complex, the general and sweeping exploratory search the appellant seems to fear never materialized. The only vehicle that was searched, the appellant's 2004 Lincoln Aviator, was particularly described in the warrant application. The warrant itself expressly provided that the affidavit of Detective Stouffer was "attached to and made a part of" the warrant itself. That affidavit explicitly described the appellant's vehicle as a 2004 Lincoln Aviator with Maryland license tag 961M179 and a vehicle identification number of 5LMEU88H94ZJ21381. That was the only vehicle that was searched. When "determining whether a warrant adequately describes the place to be searched, it is permissible to look to the affidavit as well as the warrant since the affidavit is part of the warrant and incorporated by reference therein." *Brock v. State,* 54 Md.App. 457, 469, 458 A.2d 915 (1983). *See also Frey v. State,* 3 Md.App. 38, 47, 237 A.2d 774 (1968). *And see Green v. State,* 38 Md.App. 63, 68, 379 A.2d 428 (1977).

## D.  A Typo or a Prophecy?

The fourth subcontention was singularly unenlightening:

Fourth, the inventory provided to the Court was dated "one year prior to the actual search," in this case.

Assuming that the inventory came after the search rather than anticipating it a year in advance, it is beyond our comprehension what retroactive damage the mistake in dating could do to a search that was already a *fait accompli.* The appellant does not tell us.[1] If, on the other hand, this was not a typo, it was a miracle.

---

1.  If the merits of the subcontention were at all pertinent, we would subscribe to the sage wisdom of the State, which tells us that the dating mistake "reflected the manifestation of the practice, common among

### E.    A Descriptive Error:

The fifth subcontention states simply:

> Fifth, as the State conceded at the suppression hearing, the application for a search warrant inaccurately claims that the license number of the SUV was obtained from the operation of the MTA "tag reader" system.  By the time of the suppression hearing, it was apparent that the information in question came from some kind of "Homeland Security camera," but the "exact location" of that camera was neither known to the detective nor proffered to the Court.

■    Ironically, with this subcontention it is the appellant who wants to go outside of the "four corners" of the warrant application.  What the appellant conveniently ignores is that you cannot argue facts outside the four corners of the warrant unless and until you both 1) allege and 2) then prove that the warrant application contained a "false statement [made] knowingly and intentionally, or with reckless disregard for the truth." *Franks v. Delaware*, 438 U.S. 154, 171, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); *Fitzgerald v. State*, 153 Md.App. 601, 643, 837 A.2d 989 (2003).  The appellant has not only failed to establish any such falsity or reckless disregard, he has not even remotely alleged it.  He cannot get to where he wants to go.

If he could, *arguendo*, get there, it would still avail him naught.  What matters is that the appellant's Lincoln Aviator with "Maryland registration 961M179 traveled west on the William Preston Lane Memorial Bridge on December 13, 2008 at 0241 hours."  It does not matter in the slightest respect whether the camera that took the picture belonged to the Maryland Transportation Authority or the Department of Homeland Security.  The probable cause does not depend on the ownership of the camera.

------

individuals during the early part of a new year, to inadvertently continue to use the preceding year in a written date despite their clear (but unrealized) intention to use the current year."

## F. Knock and Announce:

The appellant's sixth and final subcontention accurately reflects the tone of the entire contention.

Sixth, the issuing judge struck from the warrant any permission to use "no knock" entry. The testimony of Detective Stouffer, however, indicated that the Baltimore City police punched a hole in the front door, causing the "ram" to go all the way through the door and land inside the apartment; whereupon, the detective heard a "percussion grenade" go off, as "a diversionary device once they entered the residence," yelling "Police." There was no testimony to any effort to knock and announce the raid, at 5:00 a.m. in the morning. Accordingly, the evidence was excludable, under *Parker v. State*, 402 Md. 372, 936 A.2d 862 (2007).

Quite aside from the fact that at the suppression hearing the appellant failed to offer any evidence on the issue and failed to offer any argument with respect to it, the subcontention is in any event bizarre. Nothing of consequence was recovered in the search of the appellant's residence. The suppression, if it were to come to that, of nothing of consequence would itself amount to nothing of consequence.

The significant evidence came from the search of the car out on the parking lot. Does the appellant suggest that the police should have rapped on the window of an unoccupied car to announce that they were coming in, even if there was no one inside to let them in? What would an appropriate waiting time be under such circumstances?

Which brings us back to the Exclusionary Rule. Even if the appellant were, *arguendo*, somehow aggrieved by the lack of a rap on the car window, the Exclusionary Rule of *Mapp v. Ohio* does not apply to such relatively trivial breaches of the Fourth Amendment as violations of the knock-and-announce rule. *Hudson v. Michigan*, 547 U.S. 586, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006). This Court added its "Amen" to that inapplicability of the Exclusionary Rule in *State v. Savage*, 170 Md.App. 149, 198–211, 906 A.2d 1054 (2006). One of our observations in that case is pertinent here.

The exclusion of evidence, moreover, is not a sanction randomly available for any police misconduct. Before evidence may be excluded, it must be shown that the evidence was, in fact, the product of the Fourth Amendment violation in issue, not simply that it was recovered after the violation. *Hudson v. Michigan* explained that the evidence recovered from the warranted search in that case would have been recovered even if the police had delayed their entry for another 20 or 30 seconds, rather than entering the house prematurely. The evidence was produced as a result of the search warrant, not as a result of the "knock and announce" violation. The evidence would have been recovered even if the police had not jumped the gun and entered a few moments earlier than they should have entered. That it might have been recovered 15 seconds later rather than 15 seconds earlier was utterly immaterial.

170 Md.App. at 203–04, 906 A.2d 1054.

Seeing no merit in any of the subcontentions, we affirm the decision of Judge Ross to deny the motion to suppress the physical evidence.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**