*Oswald Traynham v. State of Maryland*, No. 2687, September Term, 2018, Opinion by Adkins, J.

**EVIDENCE – HEARSAY – PRIOR IDENTIFICATION EXCEPTION – PHOTO ARRAY PROCEDURES**

Maryland Rule 5-802.1(c) creates an exception to the rule against hearsay for statements of identification of a person made after perceiving the person. Because the witness's statements during a photo array procedure were not positive identifications, they are hearsay.

**CRIMINAL LAW – HARMLESS AND REVERSIBLE ERROR – HEARSAY**

Erroneous admission of hearsay evidence was not harmless.

**DUE PROCESS – IDENTIFICATION – IMPROPER POLICE INFLUENCE**

When an identification is infected by improper police influence, the evidence must be screened for reliability. An improper conversation prior to trial between the police and the victim tainted future identification of the defendant by the victim. A source independent of the tainted conversation, however, rendered the in-court identification sufficiently reliable for admission.

Circuit Court for Baltimore City
Case No. 118137008

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2687

September Term, 2018

_____

OSWALD TRAYNHAM

v.

STATE OF MARYLAND
_____

Fader, C.J.,
Shaw Geter,
Adkins, Sally D.
    (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Adkins, Sally D., J.
_____

Filed: December 20, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

"[R]eliability is the linchpin in determining the admissibility of identification testimony . . . ." *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

Karen Lawson was robbed at gunpoint outside of her home. Days later, she looked at a photo array of possible suspects. On her first look at Photo No. 4 she commented "[b]eard yes," and on her second look said "[d]on't think so—not skinny enough." Oswald Traynham was the individual in Photo No. 4, and he was subsequently found guilty of armed robbery, carrying a concealed weapon, and other crimes. During his trial, the court admitted into evidence the photo array "identification." We are asked to decide whether the trial court erred by admitting the photo array—which means to decide if the array, which is hearsay, falls under any exception to the rule against hearsay. Because we hold that the photo array procedure did not constitute a prior statement of identification under Maryland Rule 5-802.1(c), and satisfied no other hearsay exception, we reverse Traynham's convictions, and remand for a new trial.

## BACKGROUND FACTS

On the evening of February 14, 2018, Karen Lawson had just parked her car on Elmora Avenue when a man approached her asking for directions. He grabbed her, put a gun to her side, took her bags, and ran away. Lawson's cash, credit cards, gift cards, and car keys were in her stolen bag.

Baltimore City Police Officer Gary Doyle responded to the scene. Lawson described her assailant to Doyle as a "black male with a bushy beard, approximately 5'10", 5'11" in height, small to medium build wearing a black cap and all black clothing." A magazine from a BB gun was recovered at the scene.

Detective Calvin Moss was the lead detective assigned to the case. The day after the robbery, Lawson told him there were charges on her credit card made after she had been robbed. Moss went to the various locations where Lawson's cards had been used (a 7-11 and two gas stations) and obtained surveillance video for the corresponding times. The footage from all three locations showed the same men, and a red Ford Explorer. Moss recorded the surveillance video from one of the locations (a BP gas station) with his phone. Moss showed that BP gas station video on his phone to Lawson; she positively identified one of the men in the video as her assailant. Moss made flyers based on still photographs of two of the subjects from the surveillance video and distributed them to officers in the area.

Officer Gary Klado received this flyer, which contained not only suspect photographs, but also a vehicle description of the Explorer. On February 16, he observed the Explorer on Harford Road. Klado approached the vehicle, photographed it, and obtained the driver's license. The driver was Traynham. After Klado relayed this information to Moss, Moss created a photo array that included Traynham's photo. Detective Steve Mahan conducted the photo array procedure with Lawson.[1] Moss and Mahan believe Lawson positively identified Traynham as her assailant in the procedure.

---

[1] A photo array identification procedure occurs when "an array of photographs, including a photograph of a suspect and additional photographs of other persons not suspected of the offense, is displayed to an eyewitness in hard copy form or by computer for the purpose of determining whether the eyewitness identifies the suspect as the perpetrator." Md. Code (2003, 2018 Repl. Vol.), § 3-506.1(a)(8) of the Public Safety Article.

Just a few hours after the photo array was conducted, Moss arrested Traynham. He searched Traynham's apartment, and found Lawson's purse, bags, and some other items. Traynham claimed that they all had been given to him by someone else. Moss returned Lawson's property to her and, while doing so, had a conversation with Lawson and her husband about the case and Traynham.

At trial, the State introduced the photo array over Traynham's objection. Lawson testified about the photo array and then, without objection, identified Traynham in court. A Baltimore City jury convicted Traynham of armed robbery, robbery, theft of property with a value of $100 – $1500, and carrying a concealed weapon. He was sentenced to ten-years' incarceration for the armed robbery conviction and a concurrent three years for the concealed weapon conviction.

Traynham presents us with one question: whether the trial court erred in admitting evidence of identification.

## DISCUSSION

*Photo Array & Testimony*

Ten days after the robbery, Mahan conducted the photo array. Lawson was shown the array twice, according to Baltimore Police Department ("BPD") procedure. Mahan made notes on the Photographic Array Action Form (the "Array Form"), and recorded what Lawson said as she reviewed the array. Lawson testified that the comments written by Mahan accurately reflected what she said to him at the time she reviewed the array. Regarding Photo No. 4—Traynham's photo—Mahan wrote that Lawson commented "[b]eard yes" on the first viewing, and "[d]on't think so—not skinny enough" on the second

pass through. Moss and Mahan viewed these comments as identifying Traynham. Traynham was arrested approximately three hours after the array procedure was conducted.

During trial, over Traynham's objections, the photo array was admitted into evidence, as well as Lawson's testimony regarding the array:

> [STATE] Q: And, Ms. Lawson, did you also have occasion to view a series of photographs in relation to your robbery?
>
> [LAWSON] A: Yes, I did.
>
> \*\*\*
>
> Q: And were you able to pick out the person that robbed you from those photos?
>
> A: From those 'photos, I did choose a person that—
>
> \*\*\*
>
> Q: Ms. Lawson, which photo did you choose?
>
> [TRAYNHAM]: Objection.
>
> [THE COURT]: Overruled.
>
> A: I chose Photo No. 4.
>
> \*\*\*
>
> Q: And why did you choose Photo No. 4?
>
> A: So looking at Photo No. 4, the beard, the color, the beard was what, you know, I mainly saw that night. That beard stuck out.

Traynham argues that the trial court erred in admitting the photo array because Lawson's statements during the procedure were not statements of "identification of a

person." Consequently, he contends, the trial court also erred in allowing Lawson's above testimony, in which she states she "chose a person," as it is hearsay. The State maintains that Lawson positively identified Traynham during the photo array, and therefore the court properly admitted the photo array and Lawson's testimony about it.[2]

Fundamental rules of evidence prevent the admission of out-of-court statements as inadmissible hearsay. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Maryland Rule 5-801(c). Hearsay is not admissible, except as provided by Maryland Rules, or by applicable statute or constitutional provision. Md. Rule 5-802. A witness's prior "statement of identification," is an exception to the rule against hearsay:

> The following statements previously made by a witness who testifies at the trial or hearing and who is subject to cross-examination concerning the statement are not excluded by the hearsay rule:
>
> ***
>
> (c) A statement that is one of identification of a person made after perceiving the person[.]

Md. Rule 5-802.1(c). Photo array procedures conducted prior to trial are admitted into evidence under Rule 5-802.1(c) as statements of identification. *See, e.g., Muhammad v. State*, 177 Md. App. 188, 292 (2007) (Rule 5-802.1(c) "deals with the pinpointing of a particular individual, such as picking someone out of a line-up or photo array").

---

[2] We note that Traynham is not making a due process challenge to the photo array procedure.

Evidentiary rulings are typically reviewed for abuse of discretion. Maryland courts, however, take a two-part approach in reviewing hearsay rulings. "[T]he trial court's ultimate determination of whether particular evidence is hearsay or whether it is admissible under a hearsay exception is owed no deference on appeal, but the factual findings underpinning this legal conclusion necessitate a more deferential standard of review." *Gordon v. State*, 431 Md. 527, 538 (2013). Here, there is no dispute that the photo array procedure, and in-court testimony characterizing it, are hearsay, therefore we will review their admissions without deference.

The State contends that "Lawson made plain that she believed Traynham's photo showed a heavier version of her assailant" and that Traynham "was entitled to attack the reliability of that identification at trial" but was not entitled to keep the identification out altogether. Although the reliability of a witness's testimony is rightfully the province of the jury, if there was no positive identification during the photo array, then the State was not entitled to get the identification in, as it does not satisfy any exception to the hearsay rule.

The State argues the issue is similar to that in *State v. Wood*, 196 Md. App. 146, 156 (2010), when the defense complained "that the original photographic identifications were made by [witnesses] with less than absolute certainty." We found those were "good arguments before the ultimate fact finder, but they have nothing to do with constitutional suppression." *Id.* This case differs from *Wood*. First, Wood invoked constitutional identification law, claiming the trial judge should have suppressed identifications because they were unreliable. The *Wood* court notes constitutional law "is something quite distinct

from evidentiary law." *Id.* at 153. Here, the issue is purely evidentiary, whether the supposed identification satisfies Md. Rule 5-802.1(c). The question in *Wood* was one of **reliability**—either the witnesses were not in a good position to get a good view of the accused, or they made their identifications with less than absolute certainty. Here the question is not of reliability but requires us to focus on the threshold issue of **identification**—did the witness even make one?

Mahan wrote down Lawson's comments for each photo, separately for the look-throughs. Lawson commented "[b]eard yes" to Photo No. 4 on the first look-through. On her second look at the array the comments noted were:

> Photo No. 1: "don't really look like him."
>
> Photo No. 2: "no."
>
> Photo No. 3: "not really."
>
> Photo No. 4: "don't think so—not skinny enough."
>
> Photo No. 5: "no."
>
> Photo No. 6: "don't think so."

The State contends that Lawson made an identification that satisfies the criteria of Rule 5-802.1(c)—but we are not persuaded. On this second, final look-through, all of Lawson's comments were non-identifications. We do not agree that the words "[b]eard yes" can overcome her subsequent statement of "don't think so—not skinny enough."

The State asserts Lawson's words "not skinny enough" bolsters the "identification" in the end, because "[h]is photo in the array from several years prior showed him looking heavier, so Lawson was correct when she noticed a discernable difference in Traynham as

he was depicted in Photo No. 4, as he appeared when he robbed her . . . ."  We see two weaknesses with the State's contention.  First, one of the instructions to witnesses on the Array Form reads, "[t]he individuals you view may not appear exactly as they did on the date of the incident."  Lawson initialed next to that instruction, signaling she understood it.  Realizing that the appearance might differ slightly from the time of the robbery, Lawson still commented "[d]on't think so—not skinny enough."  Most importantly, this comment cannot "bolster the identification in the end" if there was no positive identification to bolster.

There is no bright-line test for what constitutes a positive identification when the witness's statements are less than a "yes, that is the assailant."  An examination of photo array identifications admitted at trial, however, does reveal some significant commonalities—chief among them being that witnesses write their identifications, usually directly on the photo card.  *See Brown v. State*, 169 Md. App. 442, 461 (2006) (the witness wrote ". . . the person above, the one who shot me in the leg" on the back of the photo array); *Parker v. State*, 129 Md. App. 360, 397 (1999) (witness signed the photo array card above the defendant's picture and wrote "I [witness] saw the young man I just picked out comit[t] the crime . . ."), *rev'd on other grounds*, 365 Md. 299 (2001).

Law enforcement agencies in Maryland are required to adopt the Maryland Police Training and Standards Commission's Eyewitness Identification Model Policy ("Maryland Police Identification Policy") or adopt and implement a similar policy.  Md. Code (2003, 2011 Repl. Vol.) § 3-506(b) of the Public Safety Article.  The Maryland Police Identification Policy is based on a guide for law enforcement agencies to utilize in

obtaining accurate eyewitness evidence published by the United States Department of Justice ("DOJ"), the U.S. Dept. of Justice, Eyewitness Evidence: A Guide for Law Enforcement (1999) ("DOJ Standards"). *Maryland Police Identification Policy* at 74. DOJ Standards states that proper photo array procedures include instructing the witness that "the procedure requires the investigator to ask the witness to state, in his/her own words, how certain he/she is of any identification." *DOJ Standards* at 19. The standards direct officers to, "[d]ocument the results of the procedure in writing, including the witness' own words regarding how certain he/she is of any identification." *Id*. at 20.

The Array Form used by the BPD aligns with the Maryland Police Identification Policy, and the DOJ Standards. In its instructions to witnesses, it reads:

> After you have had an opportunity to view the photographs I will ask you the following three questions:
> 1. Do you recognize anyone?
> 2. If you do, what is the number of the person you recognize?
> 3. What role, if any, does this person play in this investigation?"

Photographic Array Form, Form 480/13, Police Department, Baltimore, Maryland. Lawson initialed next to that instruction on the Array Form. Mahan testified that he read the instructions to Lawson, but there is no evidence that Mahan complied with the directive that he make those inquiries to Lawson after her view of the array.

The Array Form also has instructions for the administrator. Number four instructs that "[i]f the witness is vague in their identification, such as 'I think it is #3' or 'It looks like #3,' the administrator should say: 'You said, I think it is #3. What do you mean by

that?' The witness' answer must be documented." An exchange discussed in *Conyers v. State*, 115 Md. App. 114, 119 (1997), provides an example of what this looks like:

> The testimony at the suppression hearing showed that Ms. English had been shown two photo array cards. Each photo array card contained six photographs and Ms. English was asked, "Do you see anyone who looks familiar in these pictures?" Ms. English pointed to the appellant's photograph and stated that he looked familiar. Detective Mitchell asked further what she meant by the phrase "he looks familiar." Ms. English stated that "he looks like the other guy." Detective Mitchell testified at the suppression hearing:
>
>> And then I said, the second guy who was [the assailant]. She said yes. I asked her, are you sure it's him? And this whole thing took about 15 seconds. And she stated, I'm sure. And then as I'm writing this, she wrote, I never forget a face.

Nothing in the record here indicates that Moss asked Lawson the required follow-up questions to clarify her statements.

The Array Form administrator instruction number seven states "[i]f identification is made after the showing, have the victim/witness document their identification, by signing the front of the photo and writing in his or her own words why they have identified the suspect." Although Lawson's signature is on the instructions page of the Array Form, she neither signed the page containing Photo No. 4, nor wrote that she identified the suspect, and why. During trial, Mahan was cross-examined about the photo array procedure:

> [DEFENSE COUNSEL] Q: Okay. And after showing it to her twice, she declined to sign her name or write anything under the picture—any picture in the array; isn't that right?
>
> [MAHAN] A: I don't know whether she declined or I didn't have her.

> Q: Well, if she had picked out one of those pictures, she would have written something and signed her name, correct? Isn't that the goal of administering a photo array?
>
> A: The goal for administering a photo array is to potentially pick out the suspect who committed the crime.

If an identification was made, Mahan should have followed instruction seven. He did not, and his failure to do so reinforces our conclusion that Lawson did not identify Traynham in the procedure.

To be sure, the goal for administering a photo array is to pick out the suspect who committed the crime—but not to undermine the credibility of an identification by failing to follow the procedures established by the DOJ and implemented by the BPD. Here, the failure to follow those procedures allowed an ambiguous result—"don't think so, too skinny"—which does not pass muster under Rule 5-802.1(c) as a statement of prior identification.

We hold that the trial court erred by admitting the photo array procedure, because it is hearsay that does not fall under any exception to the Rule. Concomitantly, the trial court erred by allowing Lawson to testify about the photo array—that testimony also was hearsay.

*Harmless Error*

> [W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed 'harmless' and a reversal is mandated.

*Dorsey v. State*, 276 Md. 638, 659 (1976). The State asserts that the photo array "identification" was one of three, with the video identification and in-court identification. It contends that these three identifications and other evidence (such as finding Lawson's belongings in Traynham's apartment) leave Traynham with no reasonable possibility to argue the photo array "identification" contributed to the verdict. Traynham counters that any purported identification evidence is compelling.

A witness identification, *or non-identification*, may be the keystone of the case. *See, e.g., Williams v. State*, 364 Md. 160, 179 (2001) ("Whether a witness can positively identify the accused at the scene of the crime is often the cardinal facet of a determination of guilt."); *Morales v. State*, 219 Md. App. 1, 15-16 (2014) ("In many instances, a witness's identification of the accused may be the feather that tips the scale in favor of conviction."). Lawson stated in court why she "chose" Photo No. 4, and discussed characteristics of the man in the picture. The photo array was published and passed around the jury. The State, in its closing argument, argued "Ms. Lawson went over that photo array in painstaking detail. Who did she pick out? The Defendant." Under these circumstances, we are not able to declare, beyond a reasonable doubt, that this "identification" (and in-court discussion of it by Lawson) did not tip the scales, and so we reverse, and direct that Traynham is entitled to a new trial.

*In-Court Identification*

Because it is likely to come up again in a new trial, we now address a second, and related issue—whether the trial court erred in admitting the in-court identification of Traynham.

Shortly after the photo array procedure was conducted, Traynham was arrested. Moss searched Traynham's apartment and recovered Lawson's stolen property. He returned Lawson's property to her and discussed the case with her. At the time Moss was wearing a bodycam issued by the BPD. The bodycam recorded this interaction between Moss, Lawson, and her husband, revealing that Moss disclosed to them that: he arrested the man he believes robbed her; the man "smokes crack"; and the man has "lost 70 pounds in the past few months" because of the drug use. Later in the interaction, Moss discussed the photo array with Lawson's husband. Moss tells him "[Lawson] picked that guy out based on the beard but she didn't feel comfortable writing on—on the whole thing because his face looked heavier. He's lost 70 pounds. It made him look different." Finally, the bodycam recording picked up Moss telling Lawson and her husband that Traynham discussed a BB gun (like the one used in the robbery), is a felon, and cannot legally possess a gun.

At this point, Traynham introduces a due process argument, contending that the conversation irretrievably taints any subsequent in-court identification by Lawson. He argues that Lawson did not make an identification during the photo array, so Lawson's later in-court identification was irretrievably tainted because Moss "contaminated the test by slipping the answer to the testee." *Conyers*, 115 Md. App. at 121 (cleaned up).

Before trial, Traynham made this same argument in a motion to exclude any potential in-court identification by Lawson. The trial court watched the bodycam video of the conversation between Moss, Lawson, and her husband before denying the motion. The court noted that any subsequent photo array procedure after the bodycam conversation

-13-

would have been tainted, but did not find that Moss's actions compromised a potential in-court identification.

Due process protects the accused from the introduction of evidence tainted by "unreliable pretrial identifications obtained through unnecessarily suggestive procedures." *Moore v. Illinois*, 434 U.S. 220, 227 (1977). "The degree of taint of the confrontation is the lynchpin of the exclusionary rule, determined by fairness as required by the Due Process Clause . . . ." *Jones v. State*, 395 Md. 97, 109 n.8 (2006) (cleaned up). Here, we have a pre-trial non-identification followed by the bodycam conversation, and then an in-court identification. We examine the reliability of the in-court identification.

When an identification procedure is challenged on due process grounds, Maryland courts utilize a two-step inquiry. *Small v. State*, 235 Md. App. 648, 670 (2018). The first step is to determine "whether the identification procedure was impermissibly suggestive." *Jones*, 395 Md. at 109. "Identification procedure" has been expanded by the Supreme Court recently to mean any "improper police influence":

> An identification infected by **improper police influence** . . . is not automatically excluded. Instead, the trial judge must screen the evidence for reliability pretrial. If there is a very substantial likelihood of irreparable misidentification, the judge must disallow presentation of the evidence at trial. But if the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth.

*Perry v. New Hampshire*, 565 U.S. 228, 231 (2012) (cleaned up). Maryland courts have utilized this expanded inquiry. *See Thomas v. State*, 213 Md. App. 388, 417 (2013) ("The

defense must initially show some unnecessary suggestiveness in the procedures employed by the police.") (cleaned up).

In *Upshur v. State*, 208 Md. App. 383 (2012), the victim was stabbed and then ran from three men in a vehicle. He told the police a person he knew as "Ace" had stabbed him, and gave a detailed description. The next day, the victim viewed a photo array of six color photographs, and was unable to identify any men in the vehicle. Police then showed the victim a single booking photo of Upshur that also identified him by name and listed charges brought against him. The victim identified Upshur as "Ace." *Id.* at 390-91. We found this procedure impermissibly suggestive. *Id.* at 401. Similarly, here the victim also failed to make a positive identification during a photo array, and then was told influential information about the suspect (by the police). Prior to making a positive identification, Lawson was told that Traynham illegally possessed a gun, was a drug addict, and (in Mahan's opinion) was guilty of this and other crimes. These facts taint any future identification of Traynham just as unnecessarily suggestive procedures would.

With the taint established, we now look to the second step of the inquiry.

> In cases that a pre-trial identification is shown to be derived from an illegal identification procedure . . . the State may still secure the admissibility of a courtroom identification by the same identifying witness if it established by clear and convincing evidence that a courtroom identification had a source independent of the prior illegal identification procedure."

*Alston v. State*, 177 Md. App. 1, 32 (2007). This Court has emphasized: "it is only where there is a very substantial likelihood of irreparable misidentification, to wit, a situation where the identification could not be found to be reliable, that exclusion would be

-15-

warranted. Short of that point, the evidence is for the jury to weigh." *Upshur*, 203 Md. App. at 401-02 (cleaned up). The burden in this step is on the State. *See Jones*, 395 Md. at 111.

In assessing whether there is a "very substantial likelihood of irreparable misidentification," we look to the factors the Supreme Court outlined in the seminal identification case, *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972):

> (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation.

"The critical inquiry is whether under the totality of the circumstances the identification is reliable even though the . . . procedure was suggestive." *Small v. State*, 464 Md. 68, 92 (2019) (citing *Biggers*, 409 U.S. at 198) (cleaned up). The State argues that Lawson's in-court testimony is reliable because before the taint Lawson had described Traynham and identified him twice. Our independent analysis will only count Lawson's description and video identification.

Lawson did have the opportunity to view Traynham at the time of the crime, and indeed, she accurately noted his beard and build. It was given only minutes after the crime, a factor enhancing reliability. Lawson also identified her assailant—still before the taint— in the video identification that occurred within 24 hours of the robbery. That identification led to flyers being made with still photos from the video, and those flyers led to Traynham's

arrest. Lawson's initial description and the video identification lead us to conclude that four of the five *Biggers* factors weigh in favor of reliability. The only factor that does not is the fourth—the level of certainty at the photo array. With four of the five *Biggers* factors satisfied, we are convinced that the the trial court did not err in concluding that the in-court identification was sufficiently reliable for admission—it had a source independent of the tainted conversation. The weight of that identification, of course, is up to the jury. We end by echoing the Supreme Court, that all witness identifications "involve some element of suggestion. Indeed, all in-court identifications do." *Perry*, 565 U.S. at 244. We reverse and remand to the Circuit Court for a new trial, with instructions to exclude the photo array as hearsay.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.**