964 A.2d 695

**Lance Michael TURNER**

**v.**

**STATE of Maryland.**

**No. 1611, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Feb. 4, 2009.

Stacy W. McCormack (Nancy S. Forster, Public Defender on the brief), Baltimore, for Appellant.

James E. Williams (Douglas F. Gansler, Atty. Gen. on the brief), Baltimore, for Appellee.

Panel: HOLLANDER, GRAEFF, CHARLES E. MOYLAN, JR., (retired, specially assigned), JJ.

CHARLES E. MOYLAN, JR., Judge, retired, specially assigned.

The appellant, Lance Michael Turner, was convicted by a Washington County jury, presided over by Judge Frederick C. Wright, III, of reckless endangerment. On this appeal, he raises the single contention that Judge Wright erroneously failed to suppress evidence of an extrajudicial identification made of him by a State's witness.

The contention evokes nostalgic memories of a period between 30 and 40 years ago when the constitutional law bearing on extrajudicial identification was at the front and center of legal consciousness. The juridical celebrity of the subject first rose and then fell in the decade between June of 1967 and June of 1977. It was in that time a regular centerpiece at all

continuing legal education seminars. As will be seen as our analysis unfolds, however, that once vital concern has more recently been reduced to little more than a sideshow, now a matter far more for jury argument than for constitutional exclusion.

### A Stupid Fight on the Parking Lot of a Bar

Driven by nothing more rational than an excess of testosterone mixed with an excess of alcohol, two young men got in a fight over nothing with three other young men on the early morning of September 1, 2006, on the parking lot of Barefoot Bernie's Bar in Hagerstown. Bryan Sprankle and Brian Aleshire had both been celebrating their birthdays with a group of friends at Barefoot Bernie's. The two of them had been drinking throughout the course of the evening and stayed at the bar until closing time.

As they adjourned their celebration and poured out onto the parking lot, they crossed the path of the appellant and two other young men. A casus belli arose as the threesome "spoke" to Brian Aleshire. He, in turn, "spoke" back. The nature of the conversation was presumably belligerent, for it provoked an immediate fight between the two camps. In the course of the melee, the appellant struck Bryan Sprankle several times over the head with a golf club. That was the *corpus delicti* of reckless endangerment. Sprankle himself never saw the person on the other end of the club. For the State, the critical challenge was the identification of the appellant as the wielder of the golf club.

### The Extrajudicial Show–Up

Officer Andrew Lewis arrived at the fight scene at one a.m. He was dispatched there for "some type of assault or fight involving a golf club." He found Bryan Sprankle bleeding profusely from the head. He learned that Brian Aleshire had been assaulted as well. Both Sprankle and Aleshire were transported by ambulance to the Washington County Hospital.

Officer Lewis then took from the scene to the police station the appellant, not yet necessarily as a suspect but as a "person

[they] needed to talk to about the incident." It was while the appellant was at the police station that the one-on-one show-up took place. Meanwhile, back at the hospital, Aleshire was being arrested for the malicious destruction of property and taken into custody. Officer Lewis was sent to the hospital to pick him up and bring him to the police station. Aleshire was intoxicated.

During the ride back to the station, Officer Lewis told Aleshire that the police "had a subject at the building that was possibly involved in the altercation." When the two of them then pulled up in front of the station, the appellant was "standing on the east side ... next to Officer Duffey." Officer Lewis then asked Aleshire "if the subject standing beside Officer Duffey was involved in the fight." Aleshire insisted, "Yes. He was the one with the golf club." Officer Lewis asked Aleshire if he was "sure about this." Aleshire insisted that he was "a hundred per cent sure." At the pretrial suppression hearing, Officer Lewis testified and there was argument from both counsel. Judge Wright ruled that the identification was admissible. This appeal timely followed.

## The Extrajudicial Show–Up

Beginning with the promulgation of the *Wade–Gilbert–Stovall* trilogy on June 12, 1967, the constitutionality of extrajudicial identifications shot into prominence and then dominated the center stage until its run ended ten years and four days later with the promulgation of *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140. Early in the run, following the lead of *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), and relying on an accused's Sixth Amendment right to counsel at any critical stage, the exclusion of identification evidence as a matter of constitutional law was in high vogue. That exclusionary trend, however, ebbed significantly with the holding in *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), that a suspect placed in a pre-indictment, as opposed to a post-indictment, line-up did not yet enjoy the protection of

the Sixth Amendment. Whatever little wind still propelled the exclusionary sails after *Kirby* effectively drifted away with the holding in *United States v. Ash*, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973), that even a post-indictment exhibition of a photograph of a suspect, either in a group picture or as part of an array of individual photographs was, unlike standing the suspect in a live line-up, not a critical stage. Under the combined impact of *Kirby* and Ash, the post-indictment line-up essentially disappeared from the world of criminal investigation, and with it any significant exclusion of identification evidence based on the Sixth Amendment's right to counsel. The once familiar line-up parade of stage and screen has been retired to the Smithsonian. Creative law enforcement procedures effectively finessed the Sixth Amendment.

Whatever vitality the *Wade–Gilbert–Stovall* trilogy still retained after 1973 was by virtue of its third member, *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). Unlike *Wade* and *Gilbert*, *Stovall* was grounded in the due process clause of the Fourteenth Amendment rather than in the right to counsel of the Sixth Amendment. In one sense, a due process claim under *Stovall* enjoyed much broader coverage than a right to counsel claim under *Wade* and *Gilbert* because a due process claim is not limited to *post-indictment* procedures and does not require that the procedure be considered a *critical stage*. On the other hand, whereas a Sixth Amendment violation results in virtually automatic exclusion of the identification, a due process violation only occasionally does so. Instead of exclusion, an arguable due process violation generally calls for a balancing of competing factors under a "totality of circumstances" approach, and this is, far more often than not, a weighing function for a jury rather than an exclusionary function for a judge. In his opinion in *Webster v. State.*, 299 Md. 581, 602, 474 A.2d 1305 (1984), Judge Orth highlighted the difference in the constitutional lenses that can be trained upon an identification procedure.

We emphasize what is obvious from the Supreme Court's opinions. *It has fashioned two sets of exclusionary rules*

*with respect to the admission of evidence* tainted by reason of having as its source a confrontation *which is constitutionally infirm. One set concerns those confrontations at which the right to counsel was not satisfied. The other applies to those confrontations which infringed the right to due process.* Although the factors to be considered in applying the rules are similar, *the two sets* call for different standards and *are separate and distinct.*

(Emphasis supplied).

In *Stovall v. Denno* itself, the Supreme Court did not hold that the questionable identification evidence there should be suppressed. It rather affirmed the legitimacy of that one-on-one show-up in a hospital room on the ground that it, albeit unquestionably suggestive, was necessary and, therefore, not impermissible. By its very nature, of course, a one-on-one show-up is suggestive, just as 99 out of every 100 judicial or in-court identifications are suggestive. (It is always a good bet that the person the witness is being asked to identify is the guy sitting at the trial table who is not dressed like a lawyer.) A jury, however, is perfectly capable of weighing the pluses and minuses of such an identification. That is why mere suggestiveness does not call for exclusion. *Stovall* pointed out that it is not a due process violation *per se* that an identification procedure is suggestive. It must be not only suggestive, but *impermissibly* suggestive. Many self-evidently suggestive one-on-one show-ups shortly after a crime has occurred are deemed to be permissibly suggestive, and therefore unoffending, because of the exigent need to take quick action before the trail goes cold. *See Billinger v. State,* 9 Md.App. 628, 636–37, 267 A.2d 275, *cert. denied,* 259 Md. 729 (1970).

Within a year after *Stovall v. Denno,* moreover, the due process test was fine-tuned still further by *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). *Simmons* made clear that evidence will not be excluded unless the identification procedure was "so impermissibly suggestive as to give rise to *a very substantial likelihood of irreparable misidentification.*" 390 U.S. at 384, 88 S.Ct. 967 (emphasis

supplied). With *Simmons* the focus turned to the ultimate reliability of the identification in question. If the identification is reliable, it, by definition, is not a misidentification. Under the due process clause, moreover, the law does not use an exclusionary sanction to regulate police procedures. The focus is on the evidence itself in terms of its ultimate reliability. If the evidence is reliable notwithstanding improper antecedent procedures, it will not be suppressed under the due process clause. What matters is the trustworthiness of the evidence, not the propriety of the governmental conduct that produced it.

The unmistakable triumph of evidentiary reliability as the dispositive criterion became evident in *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). That case stated the due process test of admissibility as one of "whether under 'the totality of the circumstances' the evidence was reliable even though the confrontation procedure was suggestive." 409 U.S. at 199, 93 S.Ct. 375. In *Biggers,* a federal District Court ruled, at a habeas corpus hearing, that an identification by a rape victim at a show-up had been so suggestive as to violate due process and that the identification had to be suppressed. The United States Court of Appeals for the Sixth Circuit agreed. 448 F.2d 91 (1971). The Supreme Court reversed, holding that the critical criterion is not suggestiveness but ultimate reliability.

Some general guidelines emerge from these cases as to the relationship between suggestiveness and misidentification. It is, first of all, *apparent that the primary evil to be avoided is "a very substantial likelihood of irreparable misidentification."*

409 U.S. at 198, 93 S.Ct. 375 (emphasis supplied).

*Neil v. Biggers,* 409 U.S. at 199, 93 S.Ct. 375, then proceeded to set forth the five criteria which, ever since, have been accepted as the measure of the ultimate reliability of an identification.

We turn, then, to *the central question, whether* under the "totality of the circumstances" *the identification was reli-*

*able even though the confrontation procedure was suggestive.* As indicated by our cases, the facts to be considered in evaluating the likelihood of misidentification include *the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.*

(Emphasis supplied).

After five years of furious activity, *see also Foster v. California,* 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969); *Coleman v. Alabama,* 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970); *Johnson v. Louisiana,* 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972); *Moore v. Illinois,* 434 U.S. 220, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977), the storm brewed in 1967 was dramatically abating. Because the critical show-up in *Neil v. Biggers* had taken place before the *Stovall v. Denno* opinion had been filed, however, *Manson v. Brathwaite* was necessary to place an unmistakable seal of approval on the earlier case and to give the *Biggers* test unchallenged authoritative legitimacy. If *Neil v. Biggers* was the handwriting on the wall, *Manson v. Brathwaite* was "the last hurrah" for heavy reliance on constitutional exclusion, and that was 32 years ago.

In *Manson v. Brathwaite,* the United States Court of Appeals for the Second Circuit held that evidence of a one-on-one photographic show-up should have been excluded because the viewing of a single photograph had been both suggestive and unnecessary. The Supreme Court reversed the Second Circuit, stating the question before it to be:

This case presents *the issue as to whether the Due Process Clause* of the Fourteenth Amendment *compels the exclusion,* in a state criminal trial, apart from any consideration of reliability, *of pretrial identification evidence ob-*

*tained by a police procedure that was both suggestive and unnecessary.*

432 U.S. at 99, 97 S.Ct. 2243 (emphasis supplied).

The Supreme Court acknowledged that the identification procedure before it had, indeed, been both suggestive and unnecessary.

*Petitioner* at the outset *acknowledges that "the procedure* in the instant case *was suggestive* [because only one photograph was used] *and unnecessary* " [because there was no emergency or exigent circumstance].

432 U.S. at 109, 97 S.Ct. 2243 (emphasis supplied).

In then analyzing the two competing responses to impermissibly suggestive identification procedures, the Court described the "more lenient approach" which it ultimately adopted.

The second, or *more lenient, approach is one that continues to rely on the totality of the circumstances. It permits the admission of the confrontation evidence if,* despite the suggestive aspect, *the out-of-court identification possesses certain features of reliability.* Its adherents feel that the per se approach is not mandated by the Due Process Clause of the Fourteenth Amendment. *This second approach,* in contrast to the other, is ad hoc and *serves to limit the societal costs imposed by a sanction that excludes relevant evidence* from consideration and evaluation by the trier of fact.

432 U.S. at 110, 97 S.Ct. 2243 (emphasis supplied).

The Supreme Court was conversely critical of the *per se* or exclusionary approach.

*[T]he per se approach suffers serious drawbacks.* Since *it denies the trier reliable evidence,* it may result, on occasion, in the guilty going free. Also, because of its rigidity, the per se approach may make error by the trial judge more likely than the totality approach. And *in those cases* in which the admission of identification evidence is error under the per se approach but not under the totality approach—cases *in which the identification is reliable despite an*

*unnecessarily suggestive identification procedure—reversal is a Draconian sanction.* Certainly, *inflexible rules of exclusion,* that may frustrate rather than promote justice *have not been viewed recently by this Court with unlimited enthusiasm.*

432 U.S. at 112–13, 97 S.Ct. 2243 (emphasis supplied). The Court was firm in its holding that the due process clause, unlike the Sixth Amendment, did not establish a strict exclusionary rule.

*The standard,* after all, *is that of fairness as required by the Due Process Clause* of the Fourteenth Amendment. *Stovall,* with its reference to "the totality of the circumstances," and *Biggers* with its continuing stress on the same totality, *did not,* singly or together, *establish a strict exclusionary rule or new standard of due process.*

432 U.S. at 113, 97 S.Ct. 2243 (emphasis supplied).

In concluding that the reliability of the evidence is the linchpin in determining admissibility, the *Manson v. Brathwaite* opinion restated the five critical criteria of *Neil v. Biggers.*

We therefore conclude that *reliability is the linchpin in determining the admissibility of identification testimony* for both pre- and post-Stovall confrontations. The factors to be considered are set out in *Biggers.* These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.

432 U.S. at 114, 97 S.Ct. 2243 (emphasis supplied).

It is only where there is "a very substantial likelihood of irreparable misidentification," to wit, a situation where the identification could not be found to be reliable, that exclusion would be warranted. Short of that point, the "evidence is for the jury to weigh."

Surely, *we cannot say that under all the circumstances of this case there is "a very substantial likelihood of irrepara-*

*ble misidentification."* *Short of that point, such evidence is for the jury to weigh.* We are content to rely upon the good sense and judgment of American juries, for *evidence with some element of untrustworthiness is customary grist for the jury mill.* Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.

432 U.S. at 116, 97 S.Ct. 2243 (emphasis supplied). With *Manson v. Brathwaite*, the ten-year sunburst of identification law was over.

### The Threshold of Impermissible Suggestiveness

Turning the microscope of *Neil v. Biggers* and *Manson v. Brathwaite* on the police station show-up in this case, there is a threshold question as to how impermissible, if at all, and how suggestive, if at all, the show-up actually was.

### A. Impermissibility

A show-up has always been considered a perfectly permissible procedure in the immediate wake of a crime while the apprehension of the criminals is still turbulently unsettled. *Foster and Forster v. State,* 272 Md. 273, 289–94, 323 A.2d 419 (1974); *Davis v. State,* 13 Md.App. 394, 402–03, 283 A.2d 432 (1971), *cert. denied,* 264 Md. 746 (1972); *Spencer v. State,* 10 Md.App. 1, 267 A.2d 323, *cert. denied,* 259 Md. 736 (1970); *Billinger v. State,* 9 Md.App. 628, 636–37, 267 A.2d 275, *cert. denied,* 259 Md. 729 (1970). In this case, the appellant had just been transported from the crime scene to the station house and the witness from the crime scene to the hospital to the station house. It all happened within less than two hours. We would be hard pressed to say that the show-up here was not a permissible procedure, but it is unnecessary for us to decide the issue.

### B. Suggestiveness

We would be similarly hard-pressed to decide that what Officer Lewis said to the witness was particularly suggestive. What Officer Lewis said was that the police "had a

subject at the building that was possibly involved in the altercation." He did not say, "We have one of the assailants," let alone, "We have the assailant who actually wielded the golf club." In conducting a show-up, the police are not required to engage in a speechless pantomime or dumb-show. It is implicit that the police want the witness to look at and see if he can identify a possible participant in a crime. *McDuffie v. State*, 115 Md.App. 359, 366–67, 693 A.2d 360 (1997). The words spoken here were about as innocuous as they could be in the context of conducting a show-up. How else do the police conduct the show-up? They have to say something. *See, e.g., Davis v. State*, 13 Md.App. at 396, 283 A.2d 432 ("The officer in charge of the cruiser then asked the victim to look inside the cruiser through the window to see if the person inside was one of the boys who had robbed him."); *Spencer v. State*, 10 Md.App. at 4, 267 A.2d 323 ("Is this the one?" was unoffending.). Once again, however, it is unnecessary for us to decide the suggestiveness issue.

### The Reliability Factors In This Case

■ Even assuming, *arguendo*, that the show-up was both suggestive and impermissible, we cannot, in the words of *Manson v. Brathwaite*, "say that under all the circumstances of this case there is 'a very substantial likelihood of irreparable misidentification.'" Short of that point, it was simply something for the jury to weigh. We turn to the *Neil v. Biggers* factors as they apply to this case.

### A. A Close Encounter of the Worst Kind

The first of the *Neil v. Biggers* factors is the opportunity of the witness to view the criminal at the time of the crime. The witness in this case was in face-to-face contact with all three of his opponents. It was the witness to whom they had spoken. It was the witness who spoke back to them. In the fight that ensued, the witness was necessarily within arm's length of those whom he hit and of those who hit him. This was, by definition, close or hand-to-hand combat. This factor strongly militates in favor of reliability.

## B. Fixing the Target in the Cross Hairs

The second *Neil v. Biggers* factor is the degree of attention that the witness was paying to the unfolding event. This is an issue that can be critical when a witness is casually looking out a car window or across the street at some random event involving strangers. Was attention really riveted on the scene? It is a quite different phenomenon when the witness is actually targeting the suspect. When the witness in this case engaged in direct verbal confrontation with the three young men who stopped him, he was without question paying close attention. When he subsequently engaged in a fight with them, he was of necessity paying full and close attention. As the witness delivered first verbal abuse and then physical abuse, he had to be focused on the recipients at whom he was aiming that abuse. He was not distracted by extraneous thoughts or events. As in *Manson v. Brathwaite*, the witness here "was not a casual or passing observer, as is so often the case with eyewitness identification." 432 U.S. at 115, 97 S.Ct. 2243. This factor also strongly militates in favor of reliability.

## C. Accuracy of Prior Description

The third *Neil v. Biggers* factor bearing on reliability is the accuracy or inaccuracy of any prior description of the suspect given by the witness. The witness in this case did not give an accurate or an inaccurate description of the appellant or his two companions. He essentially gave no description at all. Although this factor does not help to establish reliability, neither does it tend to show unreliability. For the sake of argument, however, we will gladly place this factor in the appellant's column.

## D. Level of Certainty

Another *Neil v. Biggers* factor is the level of certainty shown by the witness as he makes an out-of-court identification. When asked at the show-up whether he was "sure about this" identification of the appellant as the wielder of the golf club, the witness said that he was "a hundred per cent sure." Although defendants, to be sure, will make every effort to

disparage the basis for the witness's certainty, in the last analysis even a glib protestation of certainty still outweighs equivocation. This factor strongly militates in favor of reliability.

### E. Time Lapse Between Crime and Confrontation

The final *Neil v. Biggers* factor is the time lapse between the crime and the subsequent identification by the witness. In appellant's brief, the appellant tells us that the show-up at the police station took place "almost two hours" after the fight. What shall we make of that? Although the Supreme Court acknowledged that the time lapse between crime and confrontation in *Neil v. Biggers* troubled it, the time lapse of seven months in that case was not ultimately held to be a reason for the exclusion of the identification. In *Manson v. Brathwaite*, by contrast, the time lapse between the crime and the identification was one of two days. In assessing that factor, the Supreme Court seemed overjoyed.

*The photographic identification took place only two days later.* We do not have here the passage of weeks or months between the crime and the viewing of the photographs.

432 U.S. at 116, 97 S.Ct. 2243 (emphasis supplied). Measured against that affirmative reaction, the "almost two hours" in this case could be an occasion for dancing in the streets.[1] At

---

1. In *Foster and Forster v. State*, 272 Md. at 295–96, 323 A.2d 419, Judge O'Donnell surveyed the federal circuits and their approaches to the time lapse factor.

 [I]n *Roper v. Beto*, 454 F.2d 499, 502–03, (5th Cir.1971), the identification was made at a police station three days after a rape; in *Johnson v. United States*, 362 F.2d 43, 47 (8th Cir.1966), the confrontation took place at a police station five days after a theft; in *United States v. Quarles*, 387 F.2d 551 (4th Cir.1967), the defendant was returned to the scene of a bank robbery six days after the offense; in *Hancock v. Tollett*, 447 F.2d 1323 (6th Cir.1971), the witnesses identified the defendants respectively eight and ten days after the robbery—at the jail; in *United States ex rel. Rutherford v. Deegan*, 406 F.2d 217 (2d Cir.1969), the identification was made 11 days after the robbery, at the police station; in *United States ex rel. Carnegie v. MacDougall*, 422 F.2d 353 (2d Cir.1970), the identification of a forger took place at a police station three months after the transaction. *In*

the very least, it is a factor that militates strongly in favor of reliability. And *see McDuffie v. State*, 115 Md.App. at 367, 693 A.2d 360.

### Conclusion

The decision of Judge Wright at the pretrial hearing not to suppress the evidence of the identification at the police station show-up was eminently correct. The reliability of the show-up was a jury question. Presumably, the jury found it to have been reliable.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

---

*each of these cases the evidence of the show-up identification was held to be admissible.*
(Emphasis supplied). And *see Webster v. State*, 299 Md. 581, 621, 474 A.2d 1305 (1984) ("The time between the crime and the lineup was *only thirteen days*.") (Emphasis supplied).