REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2712

September Term, 2014

IN RE:  D.M.

Meredith,
Arthur,
Sharer, J. Frederick,
        (Retired, Specially Assigned),

JJ.

Opinion by Sharer, J.

Filed: June 29, 2016

The Circuit Court for Baltimore City, sitting as a juvenile court, found D.M., appellant, "involved" in the delinquent act of theft of property valued at less than $1,000, thus affirming the findings of the juvenile master. Appellant was subsequently committed to the Department of Juvenile Services for placement.

In this appeal, appellant raises two questions for our consideration:

1. Did the juvenile court err in refusing to permit the removal of shackles from appellant during the court proceedings?

2. Did the juvenile court err in denying appellant's motion to suppress?

For the reasons expressed herein, we find neither reversible error nor abuse of discretion, and affirm the judgments of the circuit court.

## BACKGROUND

At about 9:50 a.m. on August 5, 2014, Nicole DiHart was walking on Pratt Street in Baltimore City when her cell phone rang. As she retrieved the cell phone to answer the call, it was snatched from her hands by a young black man with short hair, whom she estimated to be between ten and 12 years of age, wearing blue jeans, blue underwear visible above the jeans, and no shirt, riding an older blue and red BMX-style bicycle. As he rode away, he looked back over his shoulder two times, allowing DiHart to see his face. When she got to work at the University of Maryland, DiHart reported the incident to the campus security officers in her building.

About two-and-a-half hours later, DiHart was contacted by the police who asked her if she would ride by in a police cruiser to view a potential suspect at a nearby McDonald's.

At the McDonald's, DiHart first noticed an older blue and red BMX-style bicycle parked nearby. She then recognized appellant as the person who had snatched her cell phone earlier that morning. She noticed that he had changed his clothes and was now wearing a shirt or jumpsuit, but was, nonetheless, able to affirmatively identify him to the police. At the adjudicatory hearing, DiHart again identified appellant as the individual who had stolen her cell phone.

Following his arrest, appellant appeared with his attorney at several hearings before a juvenile court master.[1] On November 6, 2014, appellant was brought to court for an adjudicatory hearing before the master. He was transported in leg and wrist restraints by court security officers, and remained so shackled during the proceedings.

At the outset, appellant's attorney requested that the master authorize the removal of appellant's restraints, which the master declined to order. We shall discuss that matter in further detail in Part I of this opinion. Counsel also moved to suppress DiHart's out-of-court identification. After hearing testimony from DiHart and argument from counsel, the master denied the suppression motion and ruled that appellant was involved in the theft of DiHart's cell phone.[2] The formal adjudication followed.

---

[1] As of October 1, 2015, after the relevant hearings in this case, juvenile court masters are now known as magistrates. Md. Rule 1-501 (effective March 15, 2015).

[2] By stipulation, the evidence produced at the motions hearing was incorporated into the merits trial.

Appellant filed exceptions challenging both the master's denial of his motion to suppress and her refusal to order removal of his shackles during the adjudication hearing. The exceptions were heard, on the record, in the circuit court on January 20, 2015. After hearing the arguments of counsel, the court determined that the identification procedure used by the police was not impermissibly suggestive and that DiHart's out-of-court identification was reliable. The court further concluded that requiring appellant to remain shackled during his adjudication hearing was not prejudicial. Accordingly, the court denied appellant's exceptions, and affirmed the delinquency adjudication.

## ANALYSIS

### I. Shackling During Adjudicatory Hearing

Prior to each of his hearings before the juvenile master, defense counsel requested that appellant's shackles be removed. In each instance, the master denied the request without making any findings of the need for him to remain shackled.

At the adjudicatory hearing on November 6, 2014, appellant's attorney again requested that appellant's restraints be removed during the proceedings. For understanding of the issue, we include the following exchange:

> [Defense Counsel]: I would like the restraints removed before any witnesses come into the courtroom. This is –
>
> THE COURT: They're not going to be removed. He can have them in front if the officer says it's okay.

3

[Defense Counsel]: Your Honor, this is a case that I've had (indiscernible). Most cases are a witness identifying D as the person who –

THE COURT: That happens all the time.

[Defense Counsel]: But, Your Honor, having him in shackles is an indication to the witnesses that this is the young man who did it. This is a due process issue, Your Honor. It's not just I want them off because we're having a hearing. We don't allow – in the adult system we would never allow a jury –

THE COURT: This is not the adult system, sir.

[Defense Counsel]: Okay. But the implication is the same.

THE COURT: If his hands are handcuffed in front of him then they could be down in his lap and no one can see.

[Defense Counsel]: You know, Your Honor, when you walk in the courtroom you'll see the leg shackles. They will see –

THE COURT: Oh, I'm not having anybody's leg shackles taken off.

[Defense Counsel]: Your Honor –

THE COURT: It's not going to happen, sir.

[Defense Counsel]: Then this is not going to be a fair trial because you'll be sending the signal –

THE COURT: Okay, [Defense Counsel], let's do this. We'll just go ahead and then you'll take your exception.

Now, Officer [W.] –

OFFICER [W.]: Yes.

4

THE COURT: – the young man has a trial. Is he handcuffed in front or in back right now? Okay. Now, are you going to be staying with him the whole time?

OFFICER [W.]: If I have to, probably will.

THE COURT: Okay. Are you comfortable putting his handcuffs in front?

OFFICER [W.]: No. I'm going to leave them on the back. He has a problem with his fingers so I have him –

THE COURT: Say that again.

OFFICER [W.]: He has a problem with his fingers.

THE COURT: What do you mean with his fingers?

OFFICER [W.]: He –

THE COURT: You mean he gives people the finger?

OFFICER [W.]: Yeah, he (indiscernible).

[Defense Counsel]: Your Honor, he's never done that in a courtroom.

THE COURT: Okay. Hold on. Well, here's the thing. It's going to be awhile and I don't think he can sit comfortably handcuffed behind.

[D.], –

[D.M.]: Yes.

THE COURT: – you know we don't allow that here. You don't give people the finger here in court. Do you understand that?

[D.M.]: Yes.

5

THE COURT: So I'm going to ask Officer [W.] to put your handcuffs in front and I'm going to trust you to respect the rules of court and not give anybody the finger, okay?

[D.M.]: Yes, Your Honor.

THE COURT: Okay. Now –

[Defense Counsel]: You're not giving me an exception. You're giving me a plea. This is an issue where –

THE COURT: [Defense Counsel], you do your thing, my friend. I'm just trying to run my courtroom the way I've been doing it for about 20 years now. Okay. Now, do you want to borrow a jacket or something to put over his handcuffs since the officer doesn't feel comfortable?

[Defense Counsel]: I don't see how that makes it any better, Your Honor, not really.

THE COURT: Well, other than that, he'd just have to keep them down in his lap.

[Defense Counsel]: Well, I mean, if he –

THE COURT: Your attorney, [D.], is concerned about someone seeing your handcuffs. So when you're sitting down, can you keep your hands in your lap?

[Defense Counsel]: Well, Your Honor, that's a problem too because I need him to communicate with me.

THE COURT: Well, he can talk to you in your ear.

[Defense Counsel]: I need him to write things down so I can –

THE COURT: He's not going to write anything down.

[Defense Counsel]: Are you kidding me? The last two adjudications we had all he did was write things down and he has an absolute right to communicate with –

6

THE COURT:  Well, then he can put the pad in his lap.

[Defense Counsel]:  Your Honor, you're restricting his right to effectively assist his own counsel.

THE COURT:  Well, I appreciate your argument.  I do not agree with your argument.  I'm going to try to put him in a situation where he can participate fully.  Now, actually, I don't think that people are going to be able to see all the way over there to his table.  If he wants to write on the table with a pad and pen, that's fine.  If he wants to write down in his lap, keep the pad and pen down in his lap, that's fine, too.  You two may decide that.  I'm happy to lend you something to put over his handcuffs physically so they won't be obvious or he can just –

[Defense Counsel]:  Your Honor, I'm not –

THE COURT:  – keep them in his lap.

[Defense Counsel]:  – conceding anything.  He shouldn't have handcuffs on his hands -

THE COURT:  Okay.

[Defense Counsel]:  – during trial.

THE COURT:  Okay.  Thank you, [Defense Counsel].

[Defense Counsel]:  So when the –

THE COURT:  He should have handcuffs on.  If–

[Defense Counsel]:  – witness sees him with handcuffs on –

THE COURT:  – the Court makes a decision that he should wear handcuffs, he should wear handcuffs and I have already –

[Defense Counsel]:  But there's –

THE COURT:  – spoken to –

7

[Defense Counsel]:  – no danger, Your Honor.  There's no risk of violence, Your Honor.

THE COURT:  [Defense Counsel], I am responsible.  Now, this is my training.  I am responsible for the welfare of everybody who comes into my courtroom.  I speak to the officers about security and I respect what they tell me because I am the one who will answer if someone gets hurt in here, including [D.].  So that's what - that's the perspective that I'm coming from, just so you understand.  Now –

[Defense Counsel]:  And the first allegation that's been raised (indiscernible) –

THE COURT:  Okay.  That's enough.  Don't answer me back another time.

[Defense Counsel]:  – dangerous, Your Honor.

THE COURT:  Do not answer me back another time because there's a point in time where you need to stop and say thank you Your Honor and have a seat.  Call your case.

Appellant suggests that the presumption against shackling that is recognized in adult criminal courts should likewise be applied in juvenile proceedings.  We agree and explain.

The U.S. Supreme Court has held that, in criminal proceedings against adult defendants, the Due Process Clause "prohibit[s] the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Deck v. Missouri*, 544 U.S. 622, 629 (2005).  The prohibition applies to both the guilt and penalty phases of trial, *id.* at 633, and is based on "three fundamental legal principles":  (1) the presumption of innocence; (2) the right to consult with counsel; and (3) the "courtroom's formal dignity, which includes the respectful

8

treatment of defendants...." *Id.* at 630–31. Maryland has adopted the law enunciated in

*Deck*: "The prejudice posed by security measures, and whether a compelling state interest

outweighs that prejudice, must be measured on a case by case basis." *Lovell v. State,* 347

Md. 623, 640 (1997) (quoting *Hunt v. State*, 321 Md. 387, 410 (1990)).

Nonetheless, there are practical limits to this constitutional right. Where a defendant

is "disruptive, contumacious, stubbornly defiant" in a manner that interferes with the dignity,

order, and decorum of a courtroom, the trial court has the discretion to order "constitutionally

permissible" accommodations made, after warning the defendant of those potential

consequences, up to and including expelling the defendant from the courtroom. *Illinois v.*

*Allen*, 397 U.S. 337, 343-44 (1970) (offering shackling, citation for contempt, and outright

removal from the courtroom as among acceptable means of maintaining order during

criminal proceedings). The right does not expire upon the court's use of such consequences;

once lost, it "can, of course, be reclaimed as soon as the defendant is willing to conduct

himself consistently with the decorum and respect inherent in the concept of courts and

judicial proceedings." *Id.* at 343. These measures are to be tailored to the specifics of each

case, though, and are not meant for use in a blanket application to all defendants. *Id.*

Shackling and other such accommodations are only appropriate when there is a

compelling state interest. *Wagner v. State*, 213 Md. App. 419, 477 (2013). Such essential

state interests that may justify the physical restraint of a defendant include preventing the

defendant's escape, protecting those in the courtroom, and maintaining order in the

9

courtroom.  *Hunt v. State*, 321 Md. at 410.  But, "[u]nless one or more of these factors outweigh any prejudice to the defendant, physical restraint is inappropriate."  *Id.*  A particularized finding of such must be made on the record.  *See id.*

In *Holbrook v. Flynn*, 475 U.S. 560 (1986), the Supreme Court limited the scope of the right of adults to appear without overtly suggestive security measures to the effects of its possible violation.  *Id.* at 567 ("This does not mean, however, that every practice tending to single out the accused from everyone else in the courtroom must be struck down.").  Judicial review of such a complaint is limited to determining whether "what [jurors] saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over."  *Id.* at 572.

The constitutional rights afforded adult defendants are not automatically applied to juveniles, because the juvenile system is not in the nature of criminal proceedings.  Rather, it is a system designed with the goal of treatment and rehabilitation of children, rather than punishment.  Md. Code Ann., Cts. & Jud. Proc. § 3-8A-02(a)(1); *see also In re Keith W.*, 310 Md. 99, 106 (1987).

The distinctions between the juvenile and criminal systems have engendered considerable discussion.  "Juvenile proceedings are of a special species that has been designed by the General Assembly in response to a particular need and to meet a peculiar problem."  *In re Appeal Misc. No. 32*, 29 Md. App. 701, 704 (1976).  "[A] distinction exists

10

between delinquency proceedings involving juvenile offenders and criminal proceedings involving adults in the criminal justice arena, even though the conduct underlying a delinquent act and a crime may be the same." *Lopez-Sanchez v. State*, 155 Md. App. 580, 598 (2004). "The dispositions of the juvenile court are not to be considered as punishment for a crime nor are adjudications of delinquency 'convictions', as that word is generally applied with respect to criminal proceedings." *Appeal Misc. No. 32*, 29 Md. App. at 704. Juvenile proceedings aspire to "the idealistic prospect of an intimate, informal protective proceeding," *McKeiver v. Pennsylvania*, 403 U.S. 528, 545 (1971), and "retain their special and informal nature," *In re Victor B.*, 336 Md. 85, 92 (1994) (quotation marks omitted). The purpose of juvenile delinquency proceedings is not primarily to punish the child; rather, "in disposition, the court will fashion a plan of supervision, treatment, and rehabilitation appropriate to the juvenile and serving the rehabilitative goals of the [Juvenile Causes] Act." *Lopez-Sanchez*, 155 Md. App. at 598; *see also* Cts. & Jud. Proc. § 3-8A-19(d)(1)-(2).

Given the special characteristics of the juvenile system, the procedural rights accorded to juveniles have always deviated substantially from those guaranteed to adult defendants – differences that have been insisted upon in order to meet the treatment goals of the juvenile system. *See In re Gault*, 387 U.S. 1, 14 (1967). To combat the dangers of an entirely civil system, though, where a child theoretically cannot be deprived of his constitutional rights because he has none, the Supreme Court has held that children in the juvenile system are entitled to due process. *Id.* at 30-31.

11

However, the Court has refrained from "taking the easy way with a flat holding that all rights constitutionally assured for the adult accused are to be imposed upon the state juvenile proceeding." *McKeiver v. Pennsylvania*, 403 U.S. at 545.[3] There is a careful consideration required of each right prior to extending it to juveniles, which arises from a deep respect for the juvenile system's purpose. For instance, the Supreme Court has ruled that coerced confessions may not be used against juveniles, *Haley v. Ohio*, 332 U.S. 596, 601 (1948), but it has also been held "that the juvenile is not entitled to bail, to indictment by grand jury, to a public trial or to a trial by jury," *Gault*, 387 U.S. at 14, as those rights would skew the focus from treatment of the child to something reflective of the criminal system. We have noted several other rights that Maryland courts have reviewed and found applicable to juveniles, including the right to a speedy trial, double jeopardy protections, and the right to counsel. *See Lopez-Sanchez,* 155 Md. App. at 599 (surveying Maryland case law as it pertains to rights of accused juvenile offenders). The analysis of whether a particular procedural right is guaranteed to juveniles under the Due Process Clause centers on whether granting that right would help achieve or serve to hinder the goals of the juvenile system.

We see no reason why extending to children the right guaranteed adult criminal defendants to appear in court free of shackles, absent a particularized finding of need, would impede the objectives of the juvenile system. Indeed, a presumption against shackling would

___

[3] Although the Supreme Court has not yet addressed whether juvenile defendants are or should be entitled to an individualized determination before they are required to appear shackled before a juvenile court, several states have done so.

12

more closely serve those objectives, while indiscriminate shackling threatens them.

The Court of Appeals summarized: "the overriding goal of Maryland's juvenile statutory scheme is to rehabilitate and treat delinquent juveniles so that they become useful and productive members of society." *Keith W.*, 310 Md. at 106. The General Assembly included the creation of competency, character development, protection and treatment of the child, and wholesome mental and physical development among the purposes of the Juvenile Causes Act. Cts. & Jud. Proc. § 3-8A-02(a). These are less likely to be achieved in parallel to the risks of psychological harm, of an exacerbated sense of shame, and of distrust in the court system that may arise from the unnecessary shackling of juveniles.[4]

There are practical consequences to the appearance of juveniles in restraints. While juveniles are not entitled to trial by jury, their cases often involve witnesses whose perceptions may be swayed by the sight of a child in physical restraints. Indiscriminate shackling also physically and, at times, psychologically inhibits the juvenile respondent's right to assist counsel and participate in his or her own defense. Where there is the potential

---

[4] The National Center for Mental Health and Juvenile Justice, the Child Welfare League of America, the National Juvenile Defender Center, and the National Council of Juvenile and Family Court Judges, among others, have done extensive work in collecting quantitative, qualitative, and anecdotal data regarding the ill effects of indiscriminate shackling of juveniles. The National Juvenile Defender Center created the Campaign Against Indiscriminate Juvenile Shackling in conjunction with the National Campaign to Reform State Juvenile Justice Systems; in support of the Campaign's goals, medical and mental health professionals have published detailed affidavits explaining the harmful consequences of automatic shackling of juveniles using up-to-date psychological and social research. As of the date of this opinion, nine such affidavits are available for viewing at: http://njdc.info/campaign-against-indiscriminate-juvenile-shackling/.

for the loss of liberty, a juvenile's needs in court are "comparable in seriousness to a felony prosecution." *Gault*, 387 U.S. at 36. The use of restraints may impair a juvenile's physical ability to take notes and confer freely with counsel, and it might also impair a psychological willingness to testify or answer a magistrate's questions openly and candidly. The goals of the juvenile system being rehabilitative, a juvenile's active participation in his or her defense may demonstrate to the court an eagerness to receive treatment or may help guide the court in crafting an effective and personalized treatment plan. It may further serve as an example to the juvenile of how engaging the support of others can be beneficial.

The presumption against shackling juvenile respondents has, in recent months, been one of public concern and discussion.

During the briefing in this case, effective September 21, 2015, the Court of Appeals adopted the Maryland Judicial Council's Resolution Regarding Shackling of Children in Juvenile Court.[5] For many of the same reasons appellant so eloquently asserted in his brief and during oral argument, the Resolution "adopts as policy the presumption against the shackling of children during proceedings in the Juvenile Court." Pursuant to the Resolution:

---

[5] The subject was also taken up during the 2016 Session of the General Assembly. The Senate introduced a bill prohibiting the use of restraints by the Department of Juvenile Services except under certain circumstances. Juveniles - Restraint and Searches - Limitations, S. 1072, 2016 Assemb., Reg. Sess. (Md. 2016). The Judiciary Committee of the House of Delegates amended the bill to implement a task force study instead. Task Force to Study the Restraint, Searches, and Needs of Children in the Juvenile Justice System, H.D. 1634, 2016 Assemb., Reg. Sess. (Md. 2016).

14

[A]gencies that are responsible for the transport or transfer of children to, from, and within courthouses shall retain the discretion to employ practices that will ensure the security of the child and others. Once in the court or hearing room, however, a child is to be unshackled and remain so absent a particularized security concern. The judge or juvenile magistrate conducting the proceeding shall determine whether the child needs to be shackled in the court or hearing room pursuant to this policy. Security personnel have the ongoing responsibility for maintaining security and order throughout the proceeding.[6]

While the adoption of the Judicial Council Resolution would preclude the routine use of shackles in juvenile proceedings, the fact remains that, prior to the Court of Appeals doing so, no court rule, policy, or statute precluded the shackling of juvenile offenders appearing in Maryland juvenile courts without any particularized findings that such restrictions were necessary.[7,8] Neither the Court of Appeals nor this Court has opined regarding the due process implications of in-court restraint of juvenile respondents. Likewise, the policy has never been considered by the Rules Committee as a procedural requirement.

---

[6] The full text of the Resolution is available at: http://mdcourts.gov/judicialcouncil/pdfs/resolutionregardingshackling20150921.pdf. (last visited June 27, 2016).

[7] As of a survey conducted in 2012, Maryland was among the "thirty-six states and the District of Columbia" which continued to "allow indiscriminate shackling" of juveniles during juvenile court proceedings. Kim M. McLaurin, Children in Chains: Indiscriminate Shackling of Juveniles, 38 Wash. U. J.L. & Pol'y 213, 232 (2012).

[8] The Circuit Court for Baltimore City, Division of Juvenile Causes, has since adopted the Court of Appeals policy, effective March 8, 2016.

15

The actions of the Judicial Council and the Court of Appeals are aspirational policies without, as yet, force of either statutory or case law. To effect uniformity and to eliminate disparities in practice from courtroom to courtroom, we hold that juveniles should not be shackled while appearing at juvenile court hearings, unless and until there has been a finding on the record that the juvenile poses a security concern or threat that would disrupt those particular proceedings or involve danger to the juvenile or others.

**Prejudice**

Appellant asserts that the master erred by denying defense counsel's request to remove his shackles during his adjudicatory hearing, that the master failed to make individualized findings that he posed a risk that justified the use of restraints, and that the record did not demonstrate that the restraints were necessary. Appellant concludes that, because the master's refusal to remove his restraints was so highly prejudicial, it constituted reversible error, and that the circuit court further erred by overruling his exception to the master's determinations.

In our view, the undisputed fact of D. having been restrained throughout the proceeding did not impede his right to a fair adjudicatory proceeding. It is our function to consider the scene presented to those who might have been prejudiced by the sight of the shackles and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to D.'s right to a fair proceeding. *See Holbrook*, 475 U.S. at 572. As in *Holbrook*, D. has failed to show that he was unable to communicate with his counsel, or that

16

the witness was unduly prejudiced by his restraints. DiHart made a reliable out-of-court identification prior to seeing him in restraints in the courtroom, reducing the need for a constitutionally pure in-court identification. Accordingly, we shall affirm the holding of the juvenile court overruling D.'s exceptions.

Moreover, the juvenile court master who conducted appellant's adjudicatory hearing was not bound by then-existing rules, policies, statutes, or holdings of any other jurisdiction.[9] Thus, at the time of appellant's adjudicatory hearing, whether to remove his shackles was left to the discretion of the court and no particularized findings of fact were required to justify denying defense counsel's request for removal of the shackles.

The juvenile master's function was to make factual findings and recommendations for review by the circuit court regarding the sufficiency of the evidence of appellant's involvement in the theft of DiHart's cell phone. *See* Cts. & Jud. Proc. § 3-807(d)(1) (providing "the proposals and recommendations of a master for juvenile causes do not constitute orders or final action of the court") (applicable to this case through § 3-8A-04 of same Article); Md. Rule 11-111(a)(2) (same); § 3-807(d)(2) (a master's "proposals and recommendations shall be promptly reviewed by the court, and, in the absence of timely and

---

[9] At the time of the 2012 McLaurin survey, "[o]nly eleven states ha[d] banned indiscriminate shackling of juveniles via legislation, regulation, appellate case law, or court policy." 38 Wash. U. J.L. & Pol'y 213, 239 (2012) (identifying three other states with pending legislation).

17

proper exceptions, they may be adopted by the court and appropriate orders entered based on them."); Md. Rule 11-111(c)-(d) (same).

In conducting its exceptions function, the circuit court recognized that the master was required to act as a "neutral arbitrator in the case" and to exercise her "capacity to separate and ignore any shackles" appellant was wearing during the hearing. There is no indication in the record that the master's fact-finding and application of the law was adversely affected by the shackles. Nor, despite counsel's assertions, does the record reveal that the shackles prevented appellant from taking notes or communicating effectively with his attorney during the hearing. While appellant asserts damaging prejudice, none is apparent from the record. Therefore, discerning no prejudice, we conclude that appellant's due process rights and presumption of innocence were not compromised by the master's refusal to order removal of the restraints during the adjudicatory hearing.

Appellant further suggests that DiHart may have misidentified him as her assailant at the adjudication hearing because he was the only person in the room bound in restraints. As we discuss at greater length below, neither the master nor the circuit court erred in concluding that DiHart's out-of-court identification of appellant was reliable and therefore admissible at his adjudication hearing. It was for the master to consider all the applicable circumstances, including that appellant's shackles were potentially visible, and to evaluate DiHart's credibility in light of those circumstances. The master was able, throughout the proceedings, to consider DiHart's demeanor and hear her responses to the parties' questions

18

as they occurred. The master found DiHart's testimony, which was consistent with her previous out-of-court identification, to be compelling. There is nothing in the record to indicate that the master's findings in this case were clearly erroneous.

For all the foregoing reasons, we conclude that the circuit court did not err by sustaining appellant's exception to the master's denial of his request to remove his shackles during his adjudication hearing.

## II. The Out-of-Court Identification

We turn now to the assertions that the show-up procedure utilized by the police was impermissibly suggestive and that the master erred in not granting appellant's motion to suppress the resulting out-of-court identification by DiHart. On review of D.'s exceptions, the circuit court accepted the master's findings, agreeing that her identification was reliable, based on DiHart's opportunity to view her assailant at the time of the incident, the detailed descriptions she provided regarding both her assailant and the bicycle, and the fact "that she appeared to memorize what he was wearing or the lack thereof."

Principles of due process protect those accused of criminal acts "'against the introduction of evidence of, or tainted by, unreliable pretrial identifications obtained through unnecessarily suggestive procedures.'" *James v. State*, 191 Md. App. 233, 251-52 (2010) (quoting *Webster v. State*, 299 Md. 581, 599-600 (1984)). The Court of Appeals recently reaffirmed the two-step analysis of the admissibility of an extrajudicial identification:

19

The first question is whether the identification procedure was impermissibly suggestive. If the procedure is not impermissibly suggestive, then the inquiry ends. If, however, the procedure is determined to be impermissibly suggestive, then the second step is triggered, and the court must determine whether, under the totality of circumstances, the identification was reliable. If a *prima facie* showing is made that the identification was impermissibly suggestive, then the burden shifts to the State to show, under a totality of the circumstances, that it was reliable.

*Smiley v. State*, 442 Md. 168, 180 (2015) (internal quotation marks and citations omitted).

In evaluating the reliability of an out-of-court identification, the factors we consider include the following:

(i) the opportunity of the witness to view the criminal at the time of the crime;
(ii) the witness' degree of attention;
(iii) the accuracy of the witness' prior description of the criminal;
(iv) the level of certainty demonstrated by the witness at the confrontation; [and]
(v) the length of time between the crime and the confrontation.

*Webster*, 299 Md. at 607.

This Court has emphasized: "It is only where there is 'a very substantial likelihood of irreparable misidentification,' to wit, a situation where the identification could not be found to be reliable, that exclusion would be warranted. Short of that point, the 'evidence is for the jury to weigh.'" *Turner v. State*, 184 Md. App. 175, 184 (2009) (drawing on *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977) and *Neil v. Biggers*, 409 U.S. 188 (1972)).

In assessing the admissibility of an extrajudicial identification, we look exclusively to the record of the suppression hearing and view the facts in the light most favorable to the prevailing party. *White v. State*, 374 Md. 232, 249 (2003). We accept the circuit court's factual findings unless they are clearly erroneous, but extend no deference to the circuit court's ultimate conclusion as to the admissibility of the identification. *Id.*

The evidence heard by the master revealed that DiHart contacted campus security and provided an account of the robbery she had experienced just minutes before. She also provided a detailed description of her assailant and the bicycle he had been riding. Within two-and-one-half hours, the police located a BMX-style bicycle, matching the description provided by DiHart, outside a McDonald's a few blocks from where the robbery had occurred. After detaining appellant and his bicycle, the police brought DiHart to the scene and, while she had a clear view of him from the police cruiser, she identified him as the individual who had stolen her cell phone.

On those facts, we cannot find that DiHart's identification of appellant was the product of an impermissibly suggestive procedure. "A show-up has always been considered a perfectly permissible procedure in the immediate wake of a crime while the apprehension of the criminals is still turbulently unsettled." *Turner*, 184 Md. App. at 185 (citations omitted). In this case, the show-up took place less than three hours after DiHart contacted campus security, informed them that she had been robbed, and provided a detailed

21

description of the assailant and the bicycle he was riding. Shortly thereafter, the police detained appellant with his bicycle.

To determine whether to arrest appellant for the robbery or to release him and continue the search, the police brought DiHart to the McDonald's and asked her whether the individual they had detained was, in fact, the individual who had snatched her cell phone from her hand that morning. The show-up here was a permissible procedure justified by the police's need to assess quickly whether they had the culprit, in which case the search could be concluded, or whether the culprit was still at large, in which case the suspect in custody could be released and the search could be continued while the trail was still fresh. *See Turner*, 184 Md. App. at 185, and *Green v. State*, 79 Md. App. 506, 514–15 (1989) (noting that the "practice of presenting single suspects to persons for the purpose of identification" may be justified by "the desirable objectives of fresh, accurate identification which in some instances may lead to the immediate release of an innocent suspect and at the same time enable the police to resume the search for the fleeing culprit while the trail is still fresh" (citations omitted)).

Even were we to assume that the show-up was impermissibly suggestive, we cannot "say that under all the circumstances of this case there is a very substantial likelihood of irreparable misidentification." *Turner*, 184 Md. App. at 186 (internal citations and quotation marks omitted). DiHart carefully committed the physical appearance of her assailant and his bicycle to memory as he twice looked back at her while he was riding away. DiHart was able

22

to provide a very detailed description of appellant and his bicycle that was largely consistent with his physical appearance and that of his bicycle at the time he was apprehended by the police. At the time of the show-up, DiHart was able to articulate to the police that appellant had changed his clothing, but that she was certain he was the person who had taken her cell phone only a few hours before.

We are persuaded that, under the totality of the circumstances presented, there were sufficient indicia of reliability overall to support the court's decision to admit DiHart's out-of-court identification of appellant, even were we to find that the show-up procedure utilized by the police rendered it impermissibly suggestive.[10] We conclude, therefore, that the master did not err by denying the defense motion to suppress DiHart's identification. Nor did the circuit court err in overruling appellant's objection to the admission of this evidence.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED; COSTS ASSESSED TO APPELLANT.**

---

[10] In any event, we conclude that any error in the master's admission of DiHart's identification of appellant was harmless beyond a reasonable doubt, because DiHart made an in-court identification of appellant as the assailant, without objection from defense counsel. Therefore, evidence regarding DiHart's previous out-of-court identification of appellant was cumulative.

23